**ELECTRONIC SYSTEMS ASSOCIATES, INC.,**
Appellant,

v.

**The UNITED STATES, Appellee.**

**No. 89–1415.**

United States Court of Appeals,
Federal Circuit.

Feb. 12, 1990.

James H. Roberts, III, Bishop, Cook, Purcell & Reynolds, Washington, D.C., argued for appellant. With him on the brief were Florence R. Keenan and T. George Davis, Jr., Washington, D.C.

William K. Olivier, Commercial Litigation Branch, Dept. of Justice, Washington, D.C.,

argued for appellee. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Washington, D.C., and Thomas W. Petersen, Asst. Director. Also on the brief were Carl J. Peckinpaugh, Washington, D.C., and James C. Dever, III, General Counsel's Office, Dept. of the Air Force, of counsel.

John Pike, Associate Director for Space Policy, Federation of American Scientists, Washington, D.C., was on the brief for Amicus Curiae, Space Policy of The Federation of American Scientists.

Before MAYER and MICHEL, Circuit Judges, and BENNETT, Senior Circuit Judge.

MAYER, Circuit Judge.

## OPINION

Electronic Systems Associates, Inc. (Electronic Systems) appeals the decision of the General Services Administration Board of Contract Appeals dismissing Electronic Systems' protest for lack of jurisdiction. *Electronic Sys. Assocs.*, GSBCA No. 9966-P, 89-2 B.C.A. (CCH) ¶ 21,759 (Apr. 13, 1989). We affirm.

### Background

The Rome Air Development Center, located at Griffiss Air Force Base in Rome, New York, advertised solicitation number F30602-89-R-0090 on January 23, 1989. The procurement sought a Reduced Instruction Set Computer Ada Environment (RISCAE) for radiation-hardened 32-bit (RH-32) microprocessors. The RISCAE is a programming environment consisting of an Ada compiler, debugger, macro-assembler, and linker; essentially, it is a tool used by a programmer to develop applications software written in the Ada "language" and capable of running on the RH-32. The procurement also sought the development of a "run-time" system, a software program that performs all functions "built in" to the Ada language, including trigonometric, mathematical conversation, task management, and recursion control functions. Unlike the RISCAE itself, the "run-time" program is intended to be loaded in every RH-32 chip—it is resident in the microprocessor.

Because the Air Force proposed to conduct the procurement as a total small business set-aside, Electronic Systems filed a protest with the board on March 10, 1989. The protest alleged violation of several statutes and regulations, including the Small Business Act and the Federal Information Resources Management Regulation. The Air Force responded, and the board agreed, that the Warner Amendment to the Brooks Act, Pub.L. No. 97-86, tit. IX, § 908, 95 Stat. 1117 (1981) (codified as amended at 40 U.S.C. § 759(a)(3)(C) (Supp. V 1987)), deprived the board of jurisdiction to entertain the protest.

In particular, the board rejected Electronic Systems' argument that characterizing three systems within the Strategic Defense Initiative (SDI) program, for which the procurement was chiefly intended, as "weapons" or "weapons systems" or as having a "military mission" would be inconsistent with the 1972 Anti-Ballistic Missile Treaty between the United States and the Soviet Union (ABM Treaty). The board concluded that the RISCAE procurement sought automated data processing equipment (ADPE) that is both "an integral part of a weapon or a weapons system" and "critical to the direct fulfillment of military or intelligence missions". 89-2 B.C.A. ¶ 21,759, at 109,505. Accordingly, the board dismissed the protest and Electronic Systems appealed. *See* 41 U.S.C. §§ 607(g), 609(b) (1982).

### Discussion

Electronic Systems advances here the same two arguments rejected by the board. Its first and principal argument is that, because the ABM Treaty "proscribes development of a weapon, weapons system, or a military mission under the SDI program," *ipso facto,* the SDI systems ultimately employing the fruits of this procurement cannot be "weapons" or "weapons systems" or have "military missions" within the meaning of the Warner Amendment. Alternatively, it argues that the RISCAE is neither

"integral" to a weapon or weapons system nor sufficiently "critical" to the "direct" fulfillment of a military mission to qualify under exemptions (iv) and (v) of the Warner Amendment. We think the board correctly rejected both arguments.

## A.

 Electronic Systems has no authority for the proposition that, in determining whether the board has Brooks Act jurisdiction, it must consider the impact of that determination on other laws or agreements having the force of law, like the ABM Treaty. The argument appears to be that, at this early stage of development, the SDI systems cannot be weapons systems for Brooks Act purposes because they might potentially become weapons systems proscribed by the ABM Treaty. We decline to engage in the irrelevant metaphysical debate whether weapons systems contemplated by the Warner Amendment constitute weapons systems outlawed by the ABM Treaty.

The board need consider only what the Brooks Act requires in determining whether it has jurisdiction to entertain a protest. And, as with other statutes, we must give the words of the Act their plain and ordinary meaning unless there is clear congressional intent to the contrary. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426 (Fed.Cir. 1988). Electronic Systems points to no such intent here. It relies instead on the separate and unrelated ABM Treaty, which predates both the Warner Amendment and the SDI program by at least nine years and which nowhere uses, let alone defines, the terms "weapon," "weapons system," or "military mission." Treaty Between the United States of America and the Union of Soviet Socialist Republics, May 26, 1972, United States–Soviet Union, 23 U.S.T. 3437, T.I.A.S. No. 7503.

Nor does the ABM Treaty "proscribe development of a weapon, weapons system, or a military mission under the SDI program," as Electronic Systems alleges. We need not parse the treaty language or plumb the malleable understandings of its signatories to agree with the government that the treaty does not affect research and development—short of field testing or deployment, neither of which is involved here—of the SDI systems for which the RISCAE is intended. Strategic Defense Initiative Organization, 1989 Report to Congress on the Strategic Defense Initiative (Jan. 19, 1989). Even less does it proscribe characterizing those systems as "weapons" or "weapons systems" or as having a "military mission" for the purposes of the Warner Amendment. The treaty is simply irrelevant to the jurisdictional analysis, and the routine inquiry compelled by the Warner Amendment says absolutely nothing about the Treaty.

## B.

Fearing that the delay associated with General Services Administration (GSA) oversight of ADPE procurements by the Department of Defense would harm national security, Congress in 1981 adopted the so-called "Warner Amendment" to the Brooks Act. Pub.L. No. 97–86, tit. IX, § 908, 95 Stat. 1117 (1981) (codified as amended at 40 U.S.C. § 759(a)(3)(C) (Supp. V 1987)). The Amendment qualifies the authority of the GSA Administrator to coordinate and regulate the purchase, lease, and maintenance of ADPE by federal agencies. 40 U.S.C. § 759(a)(1) (1982 & Supp. V 1987). As presently constituted, the Amendment provides:

(3) This section [759(a)(1) ] does not apply to—

\* \* \* \* \* \*

(C) the procurement by the Department of Defense of automatic data processing equipment or services if the function, operation, or use of which—

(i) involves intelligence activities;

(ii) involves cryptologic activities related to national security;

(iii) involves the command and control of military forces;

(iv) involves equipment which is an integral part of a weapon or weapons system; or

(v) is critical to the direct fulfillment of military or intelligence missions,

provided that this exclusion shall not include automatic data processing equipment used for routine administrative and business applications such as payroll, finance, logistics, and personnel management[.]

*Id.* § 759(a)(3)(C) (Supp. V 1987).

The Air Force argued, and the board agreed, that exemptions (iv) and (v) apply to the RISCAE procurement. The board based its conclusion on twelve findings, including (1) the RISCAE is solely intended for the development of real-time embedded software for the RH–32 microprocessor; (2) the RH–32 is intended to handle the signal and data processing requirements of several weapon systems which are currently part of the SDI program, including the Boost Surveillance and Tracking System (BSTS), the Space Surveillance and Tracking System (SSTS), and the Kinetic Energy Space Based Interceptors (SBIs); (3) the mission of the BSTS is to detect and track hostile missiles in the first phase of their launch profile, the mission of the SSTS is to continue to track such missiles in the midcourse of their deployment, and the mission of the SBIs is to destroy with kinetic projectiles any such missiles; (4) the BSTS, SSTS, and SBI systems cannot be built without the RH–32; (5) the Department of Defense requires that the Ada programming language be used for all weapons software development and, without the Ada compiler to be developed under the RISCAE procurement, the development of Ada software for the RH–32 would be impossible; (6) the "run-time" package developed under the RISCAE procurement will be loaded automatically into every RH–32 microprocessor programmed using the RISCAE; (7) the RISCAE will be used for development and post-deployment support of weapons system software used by the RH–32; and (8) the RISCAE and the "run-time" system are not intended or designed for administrative or business applications.

Electronic Systems does not directly challenge any of these factual findings; instead it indirectly questions the board's legal conclusion that SDI and its component systems are "weapons" or "weapons systems" with a "military mission" as those terms are used in the Brooks Act. As discussed above, it does so by gratuitously misinterpreting the reach and meaning of the ABM Treaty.

 Apart from the evidence on which the board specifically relied, which included the affidavits and depositions of both the Chief of the Command and Control Software Technology Division of the Rome Air Development Center and the Center Program Manager, other evidence supports the conclusion that the BSTS, SSTS, and SBI systems comprising SDI are weapons with a military mission. For instance, as early as 1987, the Joint Chiefs of Staff confirmed the long-term military goals of the SDI program and developed performance requirements for its first phase. Letter accompanying 1989 Strategic Defense Initiative Report to Congress from the Secretary of Defense to members of Congress (Jan. 19, 1989). Congress also recognizes the military mission of SDI, notwithstanding its admonition that the development and testing of specific SDI systems proceed in accordance with the ABM Treaty. It requires the Secretary of Defense to include in his annual SDI Report to Congress "[d]etails on what Strategic Defense Initiative technologies can be developed or deployed within the next 5 to 10 years *to defend against significant military threats and help accomplish critical military missions.*" National Defense Authorization Act For Fiscal Years 1988 and 1989, Pub.L.No. 100–180, § 231, 101 Stat. 1019, 1060 (1987) (emphasis added).

### C.

 Electronic Systems proposes that, even if SDI and its current systems have military missions, the RISCAE to be developed under this procurement is neither an integral part of those systems nor critical to the direct fulfillment of their missions. We agree with the board that the RISCAE is both.

The RISCAE procurement "involves equipment which is an integral part of a weapon or weapons system", 40 U.S.C. § 759(a)(3)(C)(iv) (Supp. V 1987), because

the "run-time" package to be developed pursuant to it will be loaded into every RH–32 microprocessor programmed using the RISCAE. The RH–32, in turn, will be embedded directly in the BSTS, SSTS, and SBI systems. The RH–32 with its resident "run-time" software is thus no different than a ruggedized combat support disk procured separately from but ultimately serving as part of a larger tactical military weapons system. *See Cyberchron Corp.,* GSBCA No. 9445–P, 88–2 B.C.A. (CCH) ¶ 20,783 (1988), *aff'd sub. nom. Cyberchron Corp. v. United States,* 867 F.2d 1407 (Fed.Cir.1989).

The board also concluded, and we agree, that the RISCAE is "critical to the direct fulfillment of military or intelligence missions...." 40 U.S.C. § 759(a)(3)(C)(v) (Supp. V 1987). It based its conclusion principally on its findings that (1) the RISCAE would be used to develop software to be embedded in weapons systems and to produce the "run-time" system that would be loaded into every RH–32; (2) the SDI systems for which the RH–32 is intended cannot be built without it; and (3) the RISCAE is clearly not intended or designed for administrative or business applications. 89–2 B.C.A. ¶ 21,759, at 109,505. These findings are sufficient to qualify the RISCAE for exemption (v) as interpreted in *PacifiCorp Capital, Inc. v. United States,* 852 F.2d 549, 551 (Fed.Cir.1988): the GSBCA has no bid protest jurisdiction over Department of Defense procurements of ADPE that are crucial to accomplishing a military mission if the ADPE is not compromised by routine administrative tasks. Indeed, as the board recognized, the RISCAE is even more intimately related to the accomplishment of military missions than was the ADPE at issue in *PacifiCorp,* which also qualified for exemption (v). The equipment procured in both cases is designed to allow for the development and post-deployment support of weapons system software, but the RISCAE includes the additional "run-time" package that is ultimately to be embedded, via the RH–32, in the BSTS, SSTS, and SBI systems.

Other board cases applying exemption (v) are entirely consistent with its application in this case. *See, e.g., Data General Serv., Inc.,* GSBCA No. 9724–P, 89–1 B.C.A. (CCH) ¶ 21,355 (1988) (ADPE provided under hardware and software maintenance contract for three systems operated by the Defense Mapping Agency Systems Center is no less critical to the direct fulfillment of military and intelligence missions than the systems themselves); *Rocky Mountain Trading Co.,* GSBCA No. 9815–P, 89–1 B.C.A. (CCH) ¶ 21,450 (1988) (spare and repair parts for subsystems that both form part of and support the operational readiness of Theatre Mission Planning Centers, which control the flight of Tomahawk cruise missiles, fall within exemption (v)); *Automated Data Management, Inc.,* GSBCA No. 9486–P, 88–3 B.C.A. (CCH) ¶ 20,848 (1988) (ADPE consisting of maintenace, supply support, training and software upgrades for the Army's Theater Automated Command and Control System, which is used for the command and control of military forces in war and crisis situations, qualifies for exemption (v)); and *Management Sys. Designers, Inc.,* GSBCA No. 9207–P, 88–1 B.C.A. (CCH) ¶ 20,404 (1987) (Telecommunications Service Priority system, used to organize the provision and restoration of telecommunication service in the event of a war or national emergency and to provide direct support to operating forces, is critical to the fulfillment of military and intelligence missions).

As in those cases, there is here a real and convincing nexus between the contract and the fulfillment of the military mission. "A decision has clearly been made by the Air Force to use the RH–32 in specified SDI systems. It is this degree of specificity which permits us to conclude that the procurement in question is not subject to the Brooks Act notwithstanding its research nature." 89–2 B.C.A. (CCH) ¶ 21,759, at 109,504.

*Conclusion*

Accordingly, the decision of the board is affirmed.

AFFIRMED