**INFORMATION SYSTEMS & NETWORKS CORPORA-TION, Appellant,**

v.

**The UNITED STATES, Appellee.**

No. 91–1124.

United States Court of Appeals, Federal Circuit.

Oct. 10, 1991.

Kenneth B. Weckstein, Epstein Becker & Green, P.C., Washington, D.C., argued for appellant. With him on the brief was Daniel B. Abrahams, of counsel.

Jane W. Vanneman, Sr. Trial Counsel, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Robert Peterson and Michael Roys, Naval Supply Center, Charleston, S.C., of counsel.

Before NIES, Chief Judge, NEWMAN, and RADER, Circuit Judges.

RADER, Circuit Judge.

Information Systems & Networks Corporation (ISN) appeals the judgment of the General Services Administration Board of Contract Appeals (Board), *Information Sys. & Networks Corp. v. United States*, No. 10775–P (GSBCA, Oct. 1, 1990), 1990 WL 146340. The Board dismissed the case for lack of jurisdiction under the Brooks Act. 40 U.S.C.App. § 759(a)(3)(C)(v) (1988). Because ISN's protest involved a contract "critical to the direct fulfillment" of a military mission, *id.*, this court affirms.

BACKGROUND

In October 1983, terrorists penetrated perimeter security and carried out a deadly attack on Marine barracks in Lebanon. In Puerto Rico, terrorists infiltrated the Muniz Air National Guard base and destroyed eleven aircraft. These tragic events prompted the United States Navy to reevaluate its security against terrorist attacks. Indeed, in 1983, the Senate Armed Services Committee encouraged the Navy to improve security at overseas bases. S.Rep. No. 74, 98th Cong., 1st Sess. (1983).

To prevent future terrorism, the Navy decided to equip four overseas air stations with intrusion detection systems. To select the sites for these elaborate security systems, the Navy performed a threat assessment. At length, the Commanders-in-Chief of Europe and of the Atlantic and Pacific fleets selected the four most vulnerable air stations: Sigonella, Italy; Roosevelt Roads, Puerto Rico; Cubi Point, Philippines; and Naples, Italy.

The Navy contract sought a high wire perimeter fence to control access and detect intrusion. Sophisticated detectors on and around the fence, buried line sensors, microwave sensors, and various other devices would ensure detection of efforts to penetrate the perimeter. Through a system of cameras and video monitors, these sensors would instantly relay alarms to control centers.

The contract also provided that the intrusion detection system would allow authorized personnel to access the bases. Upon receipt of proper codes from a remote card reader or keypad, a control center would unlock doors. Even these daily access functions, however, would include important security safeguards. For instance, the system would automatically register a threat if a door stayed open for more than the short time required for entry.

The entire system featured computers, card readers, central displays, cameras, fiber optic networks, infrared detectors, and other advanced technology. A back-up computer system would control the system in case the primary computer failed. In addition, an uninterruptable power system would support the entire network of security devices.

In 1987, the Navy awarded ISN the contract to design and install the intrusion detection system at the four vulnerable bases. During performance, ISN sought an adjustment of the contract price due to technical difficulties at the Puerto Rico base. The Navy gave ISN a notice to cure delays in the installation. On June 21, 1990, the Navy terminated ISN's contract for default. ISN disputed the default termination and requested reinstatement of the contract.

The Navy instead required bids from other contractors to complete the remaining contract work. ISN submitted an unsolicited proposal to reprocure the contract. ISN was the low bidder on the reprocurement. On August 7, 1990, the Navy reject-

ed ISN's proposal and awarded the contract to Vitro Corporation. The Navy cited the previous default termination as its reason for rejecting ISN's proposal.

On August 8, 1991, ISN filed a bid protest with the Board challenging the award to Vitro Corporation. ISN charged that the Navy reprocurement did not maximize competition as required by law. The Navy responded with a motion to dismiss on jurisdictional grounds. The Board dismissed the protest for lack of jurisdiction. This appeal followed.

## DISCUSSION

The Board derives its jurisdiction over automatic data processing equipment acquisitions from the Brooks Act. 40 U.S.C.App. § 759. The Warner Amendment, however, exempts some computer procurements from Brooks Act jurisdiction. Specifically, the Warner Amendment states:

This section does not apply to—

(C) The procurement by the Department of Defense of automatic data processing equipment or services if the function, operation, or use

. . . .

(v) is critical to the direct fulfillment of military or intelligence missions, provided that this exclusion shall not include automatic data processing equipment used for routine administrative and business applications such as payroll, finance, logistics and personnel management.

40 U.S.C.App. § 759(a)(3) (Supp. V 1987).

The Board determined that the Navy's reprocurement of the intrusion detection system contract fell within the Warner Amendment exemption. This court must determine whether the Board correctly interpreted and applied exemption (v) of the Warner Amendment. This task involves three requirements of sub-part (v).

The court must first determine whether the Navy's reprocurement involves a military or intelligence mission. See Electronic Sys. Assocs. v. United States, 895 F.2d 1398, 1401 (Fed.Cir.1990). If the reprocurement involves such a mission, the court must determine whether the Navy's contract is critical to the mission's direct fulfillment. See id. at 1402. Finally, the court must determine whether the Navy will use the computers for routine administrative tasks. Electronic Sys., 895 F.2d at 1401; Pacificorp Capital, Inc. v. United States, 852 F.2d 549, 551 (Fed.Cir.1988).

■ Exemption (v) of the Warner Amendment requires a "real and convincing nexus between the contract and the fulfillment of [a] military mission." Electronic Sys., 895 F.2d at 1402. This court has discerned this nexus between a contract to detect and prevent missile attacks and the mission of defending against military threats. Id. at 1401. Not all computers used by the military, however, contribute to a "military or intelligence mission" under the Warner Amendment. See, e.g., Systems Management Am. Corp., 89–1 BCA ¶ 107,660 (1988). For instance, the Warner Amendment itself clarifies that computers used for routine administrative and business applications do not qualify for the "military mission" exclusion. 40 U.S.C.App. § 759(a)(3)(C)(v).

■ Protecting American lives, property, and interests against hostile attack is the quintessential military mission. This mission requires efforts to detect and defend against attacks. With this contract, the Navy seeks to detect and prevent terrorist attacks on American air bases. The Board correctly found a nexus between this contract to detect and prevent terrorist attacks and defending against military threats. Because detecting terrorist intruders is a military mission, this contract satisfies the military mission requirement of exemption (v) of the Warner Amendment.

The Warner Amendment also requires that a contract be "critical to the direct fulfillment" of the military mission. 40 U.S.C.App. 759(a)(3)(C)(v). This court has clarified that a contract meets this requirement if crucial or indispensable to the mission. See Pacificorp, 852 F.2d at 551.

The Board correctly found that the intrusion detection contract was critical to the direct fulfillment of the military mission of

protecting against threats to American lives and interests. The record before the Board shows abundant evidence about the vulnerability of the four bases this contract would help protect. Some of this nation's foremost experts on managing military threats selected these four bases for the contract's enhanced protection. These military commanders concluded that the Navy cannot provide adequate security without installation of the proposed intrusion detection system. In sum, the record amply supports the conclusion that, without the contract, the military mission of protecting against hostile attack would be in jeopardy. Thus, this contract falls squarely within the statutory meaning of "critical to the direct fulfillment of [a] military ... mission[ ]."

Exemption (v) of the Warner Amendment contains an exception. Computers "used for routine administrative or business applications" do not fall within the Warner Amendment. 40 U.S.C.App. § 759(a)(3)(C)(v). This court and the Board have consistently applied this language to routine functions, like those mentioned in the statute (e.g., payroll and personnel management)—functions other than those critical to a military mission.

In *Pacificorp*, for instance, this court concluded that a support computer for software in various weapons was exclusively dedicated to a military mission. *Pacificorp*, 852 F.2d at 551. Therefore, this court did not find any routine administrative applications in the weapons software. *Id.* The Board similarly found that spare computer parts for the Tomahawk missile were used "only in connection with the military applications" and not for routine applications. *Rocky Mountain Trading Co.*, 89–1 BCA ¶ 21,450, at 108,094, 1988 WL 137846 (1988); *accord, Aydin Computer & Monitor Div.*, 89–2 BCA ¶ 21,745, 1989 WL 32414 (1989); *Management Sys. Designers, Inc.*, 88–1 BCA ¶ 20,404, 1987 WL 46032 (1987). On the other hand, the Board determined that a computer "merely used by maintenance personnel to assist in finding parts and instruction manuals" performed only routine functions. *Systems Management*, 89–1 BCA at 107,660. The Board found no military mission under the Warner Amendment for which this computer performed critical functions. *Id.*

The Navy does not propose to install intrusion detection systems at all of its bases throughout the world. Rather, it chose four sites to respond to threats in those regions. The sole purpose of intrusion detection systems is to respond to these threats. This mission requires the system to control access to the bases.

Though daily and regular, this monitoring function is not a "routine administrative or business application," but an important function within the detection system's military mission. Protection against terrorist threats requires around-the-clock surveillance. Each entrance onto the base is a potential security breach which could endanger American lives and interests. Because the computer does not perform routine functions beyond the scope of its military mission, the exception to exemption (v) does not apply in this case.

## CONCLUSION

The Board correctly determined that the intrusion detection systems are critical to the direct fulfillment of a military mission. Moreover, these computer systems will not have routine administrative or business applications. Therefore, this reprocurement contract falls within exemption (v) of the Warner Amendment. The Board correctly determined that the Warner Amendment to the Brooks Act deprived it of jurisdiction over this reprocurement. The decision of the GSBCA is

AFFIRMED.