Duane **VERRETT**, individually and on behalf of all others similarly situated Plaintiffs,

v.

**THE SABRE GROUP, INC.,** a Delaware corporation, Defendant.

No. 97–C–782K.

United States District Court, N.D. Oklahoma.

Aug. 30, 1999.

7. See footnote 1.

Steven R Hickman, Frasier Frasier & Hickman, Tulsa, OK, for Duane Verrett, Terri Oden, Carlos A Rodriguez, Frederick Wiley, Kathy Wiley, Leddia M Schaefer, Steve R Swift, Timothy A Yeakey, Joe T Budzisz, Jimmy Patton, Keith Fishback, plaintiffs.

David Ryan Cordell, Conner & Winters, Tulsa, John J Gallagher, Paul Hastings Janofsky & Walker LLP, Washington, DC, for Sabre Group, Inc., the, defendants.

### ORDER

KERN, Chief Judge.

Before the Court is the Motion of Defendant, The SABRE Group, ("SABRE") to Dismiss or in the Alternative for Summary Judgment (# 18). The sole allegation in this lawsuit is that the Defendant, the SABRE Group, Inc. ("SABRE") violated the overtime pay requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C.A. § 207 (1998). SABRE has moved to dismiss this action on the grounds that, as a matter of law, it is exempt from the overtime requirements of the FLSA. Alternatively, SABRE seeks summary judgment on the same grounds. The FLSA specifically exempts from the overtime requirements of the FLSA an employer who is a "carrier" subject to the Railway Labor Act ("RLA"), 29 U.S.C.A. § 213 (1998). Defendant argues that, because SABRE is a "carrier" as defined by the RLA, SABRE is exempt from the overtime pay requirements of the FLSA.

### I. Statement of Facts

For more than 20 years, American Airlines ("American") has relied upon two broad categories of services now provided through the entity known as SABRE: (1) management information systems and (2) computer reservations services.

### A. Airline Management Information Systems

SABRE's management information services are customized and specifically developed for the air travel industry, including computer systems for planning and operating flight schedules, flight operations, aircraft maintenance records and schedules, bag handling, crew scheduling, and financial accounting, record keeping, and reporting. SABRE provides all of these services to its affiliates—American, American Eagle Airlines, Inc. and AMR Services, Inc., all of which are subject to the RLA. SABRE also provides a broad range of similar information technology and services to non-affiliated airlines, including U.S. Airways, Canadian Airlines, and Gulf Air. All of these air carriers depend on systems and data provided by SABRE in order to operate their day to day flight operations, scheduling, maintenance, bag handling, crew schedules, and many other functions critical to the safe and efficient operation of the airlines. Nearly 75 airlines rely on at least one product or service from SABRE in areas such as reservations, flight operations, and passenger handling.

### B. Airline Computer Reservation Systems

In addition to providing management information systems and support to air carriers, SABRE owns and operates a computer reservation system ("CRS") which is the largest electronic distributor of air travel in the United States, and one of the largest in the world. One-third of all travel reservations in the world and approximately 45% in the United States are booked through the SABRE system. SABRE contracts with air carriers to list their flight schedules and process reservations. American is the largest single air carrier client of SABRE. The SABRE CRS is utilized by each airline's internal reservations personnel and by travel agencies in approximately 40,000 locations in over 108 countries to book reservations on more than 420 airlines, 40,000 hotel properties, and 55 car rental companies. The SABRE CRS lists more than 50 million air fare and itineraries and updates airline fare change information five times daily. More than 375 million bookings are made annually; one million are purged and added each day.

Most SABRE employees were directly employed by American prior to the corporate reorganization in 1996 and most continue today to do essentially the same work in support of air transportation for

SABRE. When SABRE entered into a contract with U.S. Airways to provide airline management information services, it hired 760 former U.S. Airways employees, who also continue to do largely the same work for SABRE they did when employed by U.S. Airways. All SABRE employees continue to receive flight pass privileges on American and American Eagle and many of the world's other airlines.

### D. Corporate Structure & Control

From its creation in 1986, until July 1996, SABRE's principal operations were an internal unit of American. On July 1, 1996, the technology and systems operations formerly conducted by the SABRE of American were combined with related units of American's parent, AMR Corporation and restructured in the SABRE Group, Inc., which is wholly owned by the SABRE Group Holdings, Inc., ("TSGH") (a holding company). This reorganization took place primarily (1) to place all airline information technology operations under a single management and legal structure; and (2) to access capital markets. On October 17, 1996, TSGH sold a new class A common stock to the public, constituting approximately 18% of the economic interest in TSGH, generating cash proceeds of approximately $589 million.

AMR owns 100% of American Airlines, Inc. and 82% of the economic ownership and 98% of the voting power of SABRE. Thus, SABRE remains under common ownership with American. Both SABRE, TSGH and American remain part of the consolidated AMR corporate group for tax reporting purposes. SABRE has been and will continue to be highly dependent upon American for both earnings and revenue.

### E. Services in Connection with Transportation

American remains by far the largest single client of the SABRE computer reservations system. The SABRE computer reservations system is subject to special federal regulatory requirements applicable to computer reservations systems that are owned, operated, controlled or marketed by "affiliates" of air carriers. 14 C.F.R. § 255 et seq (1977). These regulations are designed, in part, to control bias in favor of the related air carrier.

The airline flight operations, airport passenger processing, crew scheduling, reservations accounting and related functions SABRE currently performs for American and American Eagle, as well as other airlines such as U.S. Airways and Gulf Air, are crucial to and an integral part of the transportation functions of these carriers. If certain or large numbers of SABRE employees withdrew from service due to a labor dispute, the carriers serviced by SABRE would be severely handcuffed in their operations, and air travel on these carriers could come to a standstill. As the number of carriers serviced by SABRE continues to grow, so does the impact on flight transportation throughout the United States if SABRE could not operate due to a labor strike.

### II. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c). The Court must view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the nonmoving party will bear the burden of proof at trial, that party must "go beyond the pleadings" and identify specific facts which demonstrate the existence of an issue to be tried by the jury. *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). Additionally, although the nonmoving party need not produce evidence at the summary judgment stage in a form that is admissible at trial, the content or substance of

such evidence must be admissible. *Thomas v. Internat'l Business Machines,* 48 F.3d 478, 485 (10th Cir.1995).

## III. Discussion

### A. Definition of "Carrier" Under the Railway Labor Act

■ The Railway labor Act creates a special scheme to govern the labor relations of railroads and airlines because of their unique role in serving the traveling and shipping public in interstate commerce. Congress declared a principal purpose of the Act "to avoid any interruption to commerce" arising from labor disputes. 45 U.S.C. § 151a. To achieve this goal, the RLA provides for creation of various boards for mediation, arbitration, and Emergency Boards to resolve labor disputes that could disrupt interstate commerce.

In 1934 Congress amended the RLA and expanded the definition of "carrier" to include carrier affiliates that perform transportation-related services:

> The term "carrier" includes any carrier by railroad... and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service... in connection with the transportation....of property by railroad. 45 U.S.C. § 151.

■ Congress expanded the definition of carrier in order (1) to avoid the possibility that certain employees could interrupt commerce with a strike, and (2) to prevent a carrier covered by the RLA from evading the purposes of the Act by spinning off components of its operation into subsidiaries or related companies. *See Virginian Ry. v. System Federation No. 40,* 300 U.S. 515, 556, 57 S.Ct. 592, 81 L.Ed. 789 (1937). When the activities of carrier affiliates are necessary to the operations of an air carrier, and a labor dispute at the affiliate could cripple airline operations, those affiliates must be subject to the RLA because such

disruption is the very type of interruption to air commerce the RLA was designed to prevent. 45 U.S.C. § 151a. For these reasons, the FLSA specifically exempts "carriers" under the RLA from its overtime requirements. 29 U.S.C. § 213(b)(3).

### A. The Two–Part Test for RLA Coverage: Common Control and Transportation Functions

■ The NMB and the courts interpreting the jurisdictional language of the RLA and analogous acts have consistently applied a two-part test to determine if an entity is a carrier subject to the RLA:

> The definition of a carrier... under the Act requires application of a two -part test, one part relating to ownership or control, and the other part relating to the company's functions vis-a-vis transportation. A company must meeting both tests to be deemed a "carrier" under the Act. *Cybernetics and Systems, Inc.,* 10 N.M.B. 334, 339 (1983). *See also Standard Office Bldg. Corp. v. United States,* 819 F.2d 1371, 1373 (7th Cir.1987).

### 1. Controlled By or Under Common Control with a Carrier

■ The "control" prong of the two-part test is readily satisfied in corporate structures where the subject company and an airline are both owned by the same corporate holding company. In *Delpro Co. v. NMB,* 509 F.Supp. 468 (D.Del.1981); *Delpro Co. v. B.Ry. Carmen,* 519 F.Supp. 842 (D.Del.1981), *aff'd* 676 F.2d 960 (3rd Cir. 1982), *cert. denied,* 459 U.S. 989, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982), the court found "control" by the mere fact of ownership, where a group of carriers owned Delpro's parent, in which turn owned 100% of Delpro. The court in *Delpro* concluded that this ownership pattern was enough in itself to establish control, without requiring examination of the control of day to day operations.

The NMB consistently has concluded that corporate relationships like that be-

tween American and SABRE satisfy the "control" element of the jurisdictional test. In *AMR Services Corp.*, 18 N.M.B. 348 (1991) the Board held that an AMR subsidiary performing ground services for American and other AIRLINES is a carrier covered by the RLA: "AMR Services is wholly owned by AMR Corporation, the holding company which wholly owns American Airline and American Eagle. AMR Services is controlled by the same entity which controls American Airlines and American Eagle." *Id.* at 350.

In *AMR Combs–Memphis, Inc.*, 18 N.M.B. 380 (1991), AMR Combs was 100% owned by AMR Services, Inc. The Board noted that it had recently "found [AMR Services] to be a carrier under the Railway Labor Act... Since AMR [Combs] is directly owned by a carrier, we do not reach the issue of the extent of control exercised by the client carriers over AMR Combs–Memphis." *Id.* at 381. The board concluded "AMR Combs–Memphis, Inc. is a carrier under the Railway Labor Act and its employees are subject to the Railway Labor Act." *Id.* at 381–382.

In *Cybernetics and Systems, Inc.*, 10 N.M.B. 334 (1983), the CSX holding company, which owned railroads, also owned L & N Investment (a real estate investment firm) which in turn owned Cybernetics. The NMB concluded the statutory test of common control was satisfied, stating "[Cybernetics] is owned by a subsidiary of a carrier... and its parent railroad holding company. Its officers and directors are, with one exception, officers and directors of rail carriers." *Id.* at 339.

*O/O Truck Sales, Inc.*, 21 N.M.B. 258 (1994), confirmed that the NMB considers control established automatically in a corporate structure where a holding company owns the entity in question as well as a carrier. There, O/O Truck Sales, Inc. was wholly owned by CSX Intermodel (CSXI), a subsidiary of the CSX holding company. Another CSX subsidiary was the railroad, CSX Transportation (CSXT). The Board held that because O/O was indirectly

owned by CSX (through CSXI), it was controlled by the same corporate parent as the railroad and the "control" prong of the test automatically was established.

In light of these cases, as well oral arguments presented on this issue, this Court finds that SABRE is devoted, almost entirely, to effecting air transportation. SABRE is under the common control of American, and clearly meets the first prong of the "carrier" definition under the RLA.

### 2. Transportation–Related Services

SABRE has a mutually co-dependent relationship with the carriers it services. In fact, there can be no doubt that SABRE's specialized information technology services for airline flight operations, airport passenger processing, crew scheduling, passenger reservations, accounting and related functions for American and other airlines are an integral part of the air carriers' transportation function. Airline operations would cease without these services. Because SABRE employees perform and monitor the computer programming and computer operations that are critical to airline functions such as flight operations and scheduling, any job action by SABRE employees, however slight, would disrupt the operations, and possibly imperil the safety of these airlines.

In *Cybernetics and Systems, Inc.*, 10 N.M.B. 334 (1983), the NMB determined a computer services company, spun off from the CSX corporate family, continued to be a carrier covered by the RLA. Cybernetics performed various computer services. *Id.* at 336. Cybernetics continued to provide support to railroads, and to non-railroad customers. Only 45% of man-hours were spent in work for railroads. *Id.* at 377. The NMB concluded:

> Railroads perform various accounting and data processing functions.... While C & S refuses to divulge the specific work done for specific carriers, a quarter of million man-hours a year is a substantial amount of railroad work.

Work essential to the operation of a railroad is no less railroad work simply because the carrier creates a subsidiary to perform that work. *Id.* at 339.

■ SABRE's circumstances are clearly distinguishable from those few cases where the services of the affiliated company have only a tenuous, negligible and remote relationship to air transportation. *See Northwest v. Jackson, supra,* 185 F.2d 74, 77 (8th Cir.1950). SABRE is covered by the RLA and the FLSA exemption, because SABRE's functions are integrally related to air transportation and have historically been performed by airline employees. The fact that such systems are now more complex and are managed with computer technology does not detract from the fact that the underlying data and functions are still airline data and functions, but instead emphasizes the sophistication and complexity of SABRE's services upon which air carriers must rely. The fact that a company provides services to carriers and to some non-carriers does not detract from RLA jurisdiction, as long as there is still an essential element of transportation related service. *Cybernetics,* 10 N.M.B. at 339.

The Plaintiff opposes this motion for summary judgment, arguing that an employee must be involved in the air carrier's transportation function in order to be eligible for an exemption under the RLA. Furthermore, Plaintiff contends: "There is no evidence in this action demonstrating that the Plaintiff employees here fall within the transportation function of a carrier by air as opposed to other duties."

■ The Court finds that the Plaintiff has not presented any evidence that SABRE is not absolutely integral and devoted to continued air transportation. In sum, activities that traditionally have been performed by employees of air carriers do not cease to be an integral part of transportation simply because they have been spun off into a separate corporation. To effectuate the primary purpose of the RLA to prevent interruptions in interstate commerce, the Court finds that SABRE is a carrier subject to the Railway Labor Act, and therefore exempt from the overtime requirements of the FLSA.

## IV. Conclusion:

The Plaintiff has presented no genuine issue of material fact for trial. The Court finds that SABRE meets the two part test for status as a "carrier" subject to the RLA because it is under common control with American and performs services in relation to transportation. Accordingly, SABRE is exempt from the overtime provisions of the FLSA. The Defendant's Motion for Summary Judgment (# 18) is GRANTED.