United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 16, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

**For the Fifth Circuit**

No. 01-31227

LARRY J. THIBODEAUX, JR., individually and on behalf of all those
similarly situated,

Plaintiff - Appellee,

VERSUS

EXECUTIVE JET INTERNATIONAL, INC.,

Defendant - Appellant.

Appeal from the United States District Court
For the Eastern District of Louisiana

Before DAVIS, BARKSDALE, and DENNIS, Circuit Judges.

PER CURIAM:

Larry Thibodeaux, a flight attendant for Executive Jet International, Inc. ("EJI"), brought this action on behalf of himself and all other similarly situated flight attendants employed by EJI, alleging that they were denied the overtime compensation required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19. The district court granted summary judgment in

-1-

Thibodeaux's favor on the issue of liability under the Act. EJI appeals and contends that it is not liable for overtime compensation because § 13(b)(3) of the FLSA exempts Thibodeaux and his fellow flight attendants from the Act's overtime pay requirements. We agree. Accordingly, we reverse the district court's judgment and remand this case for entry of judgment in favor of EJI.

## I. BACKGROUND

EJI has employed Larry Thibodeaux as a flight attendant since August 1998. On November 1, 2000, Thibodeaux brought this action against EJI seeking to recover unpaid overtime compensation under the FLSA. In his Complaint for Class Certification and for Damages, he alleged that he and similarly situated flight attendants regularly work over forty hours per week but are not paid overtime. Section 13(b)(3) of the FLSA provides, however, that the overtime provisions of the Act do not apply to "any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act [("RLA"), 45 U.S.C. §§ 181–88]."[1] Those subject to Title II of the RLA include "every common carrier by air engaged in interstate or foreign commerce."[2] Thus, EJI asserted in its answer to Thibodeaux's complaint that it is a "common carrier by air" subject to Title II of the RLA and that, as a consequence,

---

[1] 29 U.S.C. § 213(b)(3).

[2] 45 U.S.C. § 181.

it is not liable for overtime compensation.  Determining whether EJI's defense is a valid one requires an appreciation of its business, the business of its parent and affiliate corporations, and its regulatory environment.

A.   Executive Jet International, Inc., and Related Entities

EJI is engaged in the business of operating, maintaining, and managing Gulfstream IV and Gulfstream V aircraft that are fractionally owned or fractionally leased by persons or entities participating in a program known as "NetJets."  EJI also provides air charter services with Gulfstream aircraft.  EJI is a wholly-owned subsidiary of Executive Jet, Inc.  EJI, in turn, owns EJI Sales, Inc., a company that sells and leases aircraft to EJI's customers.  EJI has a facility in East Granby, Connecticut, and Bluffton, South Carolina, is its principal place of business.

EJI operates flights for customers under Parts 91 and 135 of the Federal Aviation Regulations ("FAR").[3]  Generally speaking, FAR Part 91 applies to private or non-commercial carriage.  "Common carriers," on the other hand, have traditionally been subject to the more stringent safety standards of FAR Part 135.  EJI operates its NetJets flights under Part 91 and its charter flights under a Part 135 Certificate issued by the Federal Aviation Administration ("FAA").

According to EJI, the duties and responsibilities of its

---

[3]   See 14 C.F.R. §§ 91, 135.

flight attendants do not differ significantly from those of flight attendants employed by the major commercial airlines. As of March 2001, EJI employed ninety-eight flight attendants. Of this number, eight attendants were qualified under FAA rules and regulations to work on EJI's Part 135 charter flights in the capacity of "crewmembers." The remaining flight attendants, including Thibodeaux, worked flights operated under Part 91.

Executive Jet, Inc., also owns Executive Jet Aviation, Inc. ("EJA"), whose principal place of business is Columbus, Ohio. Like its sister EJI, EJA is engaged in the business of operating, maintaining, and managing aircraft that are fractionally owned or fractionally leased by persons or entities participating in the NetJets program. The aircraft used by EJA in the NetJets program are likewise purchased by its wholly owned subsidiary, Executive Jet Sales, Inc., and then sold or leased in fractions to EJA's customers. EJA also possesses a Part 135 Certificate, which permits it to conduct charter operations. The makes and models of aircraft currently operated by EJA are: Boeing 737, Cessna Citation V Ultra, Cessna Citation Excel, Cessna Citation VII, Cessna Citation X, Raytheon Hawker 800 XP, Raytheon Hawker 1000, and Dassault Falcon 2000.

With the exception of the type of aircraft, the record reflects little difference between the air charter operations conducted by EJA and EJI under their respective Part 135

-4-

Certificates. Similarly, with the exception of the type of aircraft, there is little difference between the nature of the owner-occupied or lessee-occupied flight operations conducted by EJA and EJI in the NetJets program pursuant to Part 91. Furthermore, each company's operations in the NetJets program far exceed its air charter operations. From 1999 to 2001, EJI operated only 2% of its flights under Part 135. It operated the remaining 98% of its flights under Part 91. EJA's operations are nearly proportional to those of its sister company.[4] One important distinction between EJA and EJI makes these similarities significant to this case: EJA's employees are unionized, but those of its younger sister EJI are not.[5]

EJA's maintenance personnel have been represented for purposes of collective bargaining by the International Brotherhood of Teamsters, Airline Division, since 1971. The Teamsters' certification was issued by the National Mediation Board ("NMB"), the federal agency responsible for administering the RLA.[6] The maintenance employees' terms and conditions of employment are governed by a collective bargaining agreement negotiated pursuant

---

[4] In 1999, EJA operated approximately 3.7% of its flights under Part 135; the remaining 96.3% of its flights were operated under Part 91. In 2000 and 2001, approximately 3.4% of EJA's flights were operated under Part 135, while the remaining 96.6% of the flights were operated under Part 91.

[5] EJI was incorporated in 1995.

[6] The district court correctly recognized that the NMB has primary jurisdiction to determine the scope of the RLA.

-5-

to the terms of the RLA. The Teamsters also represent EJA's pilots.

EJA employs flight attendants for the Falcon and Boeing aircraft it operates. All those attendants work on flights operated under Part 91. Prior to July 12, 2001, EJA's flight attendants were not represented by a labor organization. In December 1999, the NMB conducted an election among the attendants to determine whether they wanted to be represented by the Teamsters. Because less than a majority of the eligible employees cast valid ballots in the election, the NMB found no basis for certification and dismissed the Teamsters' application. But in May 2001 the Teamsters filed an application for investigation of a representation dispute with the NMB and sought another election. The NMB again exercised jurisdiction over EJA and oversaw the election. Ballots were counted on July 11, 2001, and a majority of flight attendants voted in favor of union representation.

This brief sketch of EJA's labor relations history reveals that the NMB has ruled on several occasions—most recently in July 2001—that EJA is covered by Title II of the RLA and therefore subject to the jurisdiction of the Board.[7] EJI contends that if EJA is a "common carrier by air" subject to the RLA, then it is likewise a covered carrier because its operations are virtually identical to those of EJA. Put differently, if a labor dispute

---

[7] See, e.g., In the Matter of the Representation of Employees of Executive Jet Aviation, Inc., 28 N.M.B. 471 (2001).

that had the potential to interrupt commerce arose at EJI, the company contends that the NMB would have jurisdiction over the dispute just as it did over the disputes at EJA.

## B.   The NetJets Program

The NetJets program is marketed on the internet and in publications such as The Wall Street Journal, Business Week, Business Journal, Forbes, Cigar Aficionado, Fortune, and Town and Country.  Marketing is also conducted through direct mail campaigns as well as at public and quasi-public events, such as the annual convention of the National Business Aviation Association, the Berkshire Hathaway annual shareholders meeting, the Paris Air Show, and the Farnborough Air Show.

A participant in the NetJets program will enter into three contracts.  A customer interested in flying on a Gulfstream aircraft will enter into a Purchase Agreement or Lease Agreement with EJI Sales.  The Lease Agreement is five years in duration and the leased share of the aircraft remains titled to EJI Sales.  A customer who prefers a Boeing 737, Citation, Hawker, or Falcon aircraft will enter into a Purchase Agreement or Lease Agreement with Executive Jet Sales.  The EJA Lease Agreement like the EJI Lease Agreement is five years in duration; the leased share of the aircraft remains titled to Executive Jet Sales.

Next, the customer will enter into a Management Agreement with either EJI or EJA, depending on the type of aircraft.  The

Management Agreement covers all services related to the aircraft. Thus, EJI provides pilots and flight attendants, as well as maintenance, flight planning, and other flight-related services, to owners or lessees of the Gulfstream aircraft.

The third contract is a Master Interchange Agreement between the customer and Executive Jet Services, Inc., a sister company of EJA and EJI. The Master Interchange Agreement permits an owner or lessee to use another owner's or lessee's aircraft in the event the aircraft in which he has a share is unavailable.

This alternative method of acquiring interests in aircraft has proved quite appealing to people or businesses who want ready access to air travel but cannot justify the purchase of a whole aircraft:

> By purchasing an interest in an aircraft that is part of the [NetJets] program, an owner gains round-the-clock access to a private jet at a fraction of the cost. In addition to access to the aircraft in which it owns an interest, it also has access to all other aircraft in the program, as well as the support of a management company that will handle all arrangements relating to maintenance, crew hiring, and all administrative details relating to the operation of a private aircraft.[8]

Under NetJets, neither EJI or EJA own the aircraft they manage. Instead, each participant is an owner or a lessee that, in the companies' view, operates the aircraft for itself. EJI and EJA simply provide the ancillary services that enable each owner to

---

[8] Eileen M. Gleimer, When Less Can Be More: Fractional Ownership of Aircraft—The Wings of the Future, 64 J. Air L. & Com. 979, 981 (1999).

"operate." The purported vesting of operational control in the owner is critical to the operation of the NetJets aircraft under FAR Part 91—the regulatory framework under which NetJets was developed.[9] NetJets was designed with this framework in mind because Part 91's operating rules are less restrictive than those that apply to traditional commercial operators. Among other areas, Parts 91 and 135 differ with respect to the size of airports that can be used, criteria governing the hiring of flight crews, and crew rest and duty requirements.[10]

FAR Part 91 was designed for non-commercial operations, but NetJets does not comfortably fit within the traditional understanding of private aviation. If EJI is deemed to be in operational control of the aircraft it manages, then it would be carrying passengers—namely the fractional owners and their guests—and receiving compensation in the form of an hourly operating cost plus the management fee it charges.[11] If the FAA adopted such a view, NetJets would be subject to the rules of Part 135, and those rules would dramatically affect its business.[12]

When the NetJets program began in 1986, however, FAA regional

---

[9] See id. at 1002.

[10] See id. at 1002–05.

[11] See id. at 1002.

[12] See id. at 1006 ("[C]ompliance with Part 135 would change the fundamental nature of the operation of aircraft in fractional ownership programs.").

officials concluded that NetJets could operate under Part 91.[13] But the rapid growth in the fractional ownership business has since caused the FAA to rethink its position. The FAA's study of the issue resulted in a proposed rule that will soon govern the use of aircraft in fractional ownership programs.[14] Although this recent development does not influence our decision, the foregoing regulatory background is critical to understanding Thibodeaux's successful argument in the district court that EJI is not a common carrier by air because it operates primarily under Part 91.

### C. Proceedings in the District Court

EJI moved for summary judgment in the district court claiming that § 13(b)(3) of the FLSA exempts it from overtime compensation liability because it is a common carrier by air. In denying the motion, the court first found that there were disputed issues of material fact concerning whether EJI is a "common carrier by air" subject to Title II of the RLA. More specifically, the court declined to decide whether EJI is a common carrier based on an analogy to its sister company EJA because there was no showing of the percentages of flights that EJA operates under FAR Part 135 as opposed to FAR Part 91. The court noted that only 2% of EJI's

---

[13] See id. at 1014.

[14] See Regulation of Fractional Aircraft Ownership Programs and On-Demand Operations, 66 Fed. Reg. 37,520 (July 18, 2001) (to be codified at 14 C.F.R. pt. 91); see also Eileen M. Gleimer, The Regulation of Fractional Ownership: Have the Wings of the Future Been Clipped?, 67 J. Air L. & Com. 321 (2002).

flights during the preceding three years were conducted under Part 135, while the rest were conducted under Part 91. In its view, "EJI's rather insubstantial charter operations under Part 135 . . . could play a pivotal role in the ultimate determination of whether or not EJI is a common carrier by air." Second, the court found that even if EJI is a common carrier by air, there was at least a genuine issue of material fact as to whether Thibodeaux spends more than 20% of his time each workweek performing "nonexempt" work. In support of this finding, the court relied on 29 C.F.R. § 786.1, a regulation issued by the Department of Labor providing that the § 13(b)(3) exemption applies even if an employee performs some nonexempt work during the workweek so long as the nonexempt work is not "substantial." The regulation further provides that nonexempt work is substantial if it occupies more than 20% of the employee's workweek. Suggesting that work performed on Part 91 flights is nonexempt, the district court concluded that the § 13(b)(3) exemption would be "defeated" if Thibodeaux spends more than 20% of his workweek on Part 91 flights.

After the denial of its summary judgment motion, EJI moved for reconsideration and supplied the district court with the EJA operating percentages that it previously found missing from the record. The court treated the motion as being filed under Rule 59(e) and refused to consider the supplemental information because it was available to EJI when it filed its motion for summary

-11-

judgment. But the court also stated that even if an analogy to EJA indicates that EJI is a common carrier, "the court cannot conclude as a matter of law that this exemption is applicable here because there is at least a genuine issue of material fact as to whether Plaintiff spends more than 20% of his time during the workweek performing nonexempt work." The court therefore denied the motion for reconsideration.

Following the failure of its motion for reconsideration, EJI requested a status conference with the district court. It conceded that Thibodeaux spends 100% of his time performing work on Part 91 flights and that only questions of law remained. But Thibodeaux had not filed a cross-motion for summary judgment, so EJI sought the court's guidance on how to proceed. The court held a status conference and, on the following day, entered a Rule 54(b) judgment in Thibodeaux's favor on the liability portion of the case without requiring him to file a motion for summary judgment. The court concluded, as a matter of law, that EJI is not a "common carrier by air" because it operates most of its flights under Part 91. The court was "unpersuaded by EJI's analogy to its sister company, Executive Jet Aviation, Inc., to rule otherwise." In addition, the court found that even if EJI is a "common carrier by air," thus triggering the FLSA § 13(b)(3) exemption from overtime pay, "this exemption is nevertheless inapplicable here because: (1) Plaintiff's work on Part 91 flights is 'nonexempt'; and (2) such

-12-

nonexempt work is 'substantial' because it occupies more than twenty percent of the time worked by Plaintiff."

EJI filed a notice of appeal from the district court's Rule 54(b) judgment. Because the district court's determination of EJI's liability under the FLSA was interlocutory in nature and not within the scope of Rule 54(b), this court directed the parties to brief the issue of appellate jurisdiction.[15] In response, EJI filed an unopposed motion to remand the case for certification of judgment under 28 U.S.C. § 1292(b). This court granted the motion, and the district court entered a § 1292(b) certification on remand. This court then granted EJI leave to appeal from the district court's interlocutory order, which we now treat as a grant of partial summary judgment limited to the issue of EJI's liability.[16]

## II. ANALYSIS

### A. Standard of Review

This court reviews summary judgment de novo, applying the same standards as the district court.[17] Summary judgment is appropriate when there is no genuine issue as to any material fact, and the

---

[15] See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund, 791 F.2d 548, 553 (7th Cir. 1986) ("A decision that fixes liability but not damages is not appealable, despite the entry of an order under Rule 54(b)." (citing Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737 (1976))).

[16] See Liberty Mut., 424 U.S. at 744.

[17] Cochran v. B.J. Servs. Co. USA, 302 F.3d 499, 501 (5th Cir. 2002).

moving party is entitled to judgment as a matter of law.[18]

   B.  Applicability of the Air Carrier Exemption to the FLSA

   The FLSA generally requires employers to pay premium overtime provisions to employees who work in excess of forty hours per week.[19]  There are specific exemptions, however, to the overtime requirements, including the exemption for "any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act."[20]  Those subject to Title II of the RLA include "every common carrier by air engaged in interstate or foreign commerce . . . ."[21]

   Neither the RLA nor the FLSA defines the term "common carrier by air."  In Woolsey v. National Transportation Safety Board, a case involving the FAA's revocation of a commercial pilot's certification, this court looked to the common law to determine whether the pilot's company, a small air carrier that specialized in transporting musicians, was a "common carrier" subject to FAR Part 135 or a private carrier subject to the less stringent regulations of FAR Part 91.[22]  We found that "the crucial determination in assessing the status of a carrier is whether the

---

   [18]  Fed. R. Civ. P. 56(c).

   [19]  See 29 U.S.C. § 207.

   [20]  Id. § 213(b)(3).

   [21]  45 U.S.C. § 181.

   [22]  993 F.2d 516, 522 (5th Cir. 1993).

carrier has held itself out to the public or to a definable segment of the public as being willing to transport for hire, indiscriminately."[23] And we emphasized that our test "is an objective one, relying upon what the carrier actually does rather than upon the label which the carrier attaches to its activity or the purpose which motivates it."[24]

The parties dispute the significance of the Woolsey case. Thibodeaux cites as controlling our observation that "FAR Part 91 specifically excludes common carriers from its coverage, leaving them subject to the more stringent safety standards of FAR Part 135."[25] In his view, which the district court embraced, EJI is not a common carrier because it operates most of its flights under Part 91. But the Woolsey test for common carrier status does not refer to the Federal Aviation Regulations. Indeed, the pilot in Woolsey argued that his company was not a common carrier because it designed its lease agreements with the musicians it transported with an eye to compliance with the requirements of Part 91, but we found that the company's subjective intentions were not controlling: "[W]hether or not the leases comport with the requirements of FAR Part 91, the crucial question remains whether [the company] acted as a common carrier with respect to the flights

---

[23] Id. at 523.

[24] Id. (internal quotation and citation omitted).

[25] Id. at 521–22.

-15-

in question."[26]  Similarly, EJI's belief that it can operate under Part 91 would be unavailing if the FAA revoked the license of a NetJets pilot for failure to comply with Part 135.  The key inquiry instead would be whether EJI held itself out to the public as being willing to transport for hire.

EJI argues, on the other hand, that <u>Woolsey</u> is wholly inapplicable because this case does not involve a license revocation.  It suggests that we look instead to the decisions of the National Mediation Board for a definition of the term "common carrier."  In the principal decision it cites, however, the NMB recognized that the RLA does not define the phrase "common carrier by air" and then looked to the common law for a definition, just as this court did in <u>Woolsey</u>.[27]  Although the Board was not as concise as this court, it identified the same factors and relied on some of the same authorities.  All in all, the Board's definition of common carrier does not materially differ from the test this court established in <u>Woolsey</u>.  Furthermore, in <u>Valdivieso v. Atlas Air, Inc.</u>, a case also involving the air carrier exemption to the FLSA, the Eleventh Circuit determined the characteristics of a common carrier by discussing Supreme Court and circuit court precedents instead of NMB decisions.[28]  In fact, the <u>Valdivieso</u> court cited the

---

[26] <u>Id.</u> at 518.

[27] <u>See</u> <u>In re Southern Air Transport</u>, 8 N.M.B. 31 (1980).

[28] 305 F.3d 1283, 1286–87 (11th Cir. 2002).

-16-

Woolsey decision.[29]  We therefore choose to apply our own test for common carrier status to the facts of this case.

Turning, then, to the Woolsey test, Thibodeaux argues that EJI satisfies neither its "holding out" nor its "transport for hire" elements.  He contends that there is no "holding out" because EJI does not market the NetJets program.  Instead, Executive Jet Services, EJI's sister company, conducts the program's marketing efforts.  And Thibodeaux further contends that EJI does not transport for hire because the company merely maintains and operates aircraft for customers who own their airplanes.  Thus, Thibodeaux urges us to evaluate EJI's operations narrowly rather than focusing on the NetJets program as a whole.

A 1997 case from the Federal Circuit involving EJA supports taking the broader approach.  In Executive Jet Aviation, Inc. v. United States, EJA appealed from a judgment of the Court of Federal Claims that dismissed  EJA's action for a tax refund.[30]  The refund that EJA sought represented the difference between the total air transportation taxes that were paid pursuant to Internal Revenue Code ("IRC") § 4261 with respect to certain flights EJA conducted for Texaco Air Services, a NetJets participant, and the total taxes that would have been paid had the flights instead been subject to

---

[29] See id.

[30] 125 F.3d 1463 (Fed. Cir. 1997).

-17-

the IRC § 4041(c) fuel tax for non-commercial aviation.[31] EJA argued that it had to provide the means for conveyance in order for Texaco Air's flights to have been subject to the § 4261 transportation tax. In its view, which is very similar to Thibodeaux's, providing services that facilitate the use of an aircraft by the person who owns it or has an independent right to use it (i.e., Texaco Air) does not mean that the provider is in the business of transporting persons for hire.[32] Although EJA furnishes flight-related services, NetJets participants like Texaco Air provide the means for their own conveyance; they are in operational control of the aircraft.

The Federal Circuit rejected the argument that Texaco Air's flights under the NetJets program were not subject to the transportation tax because EJA did not own or lease the aircraft it serviced. The court stated that "[t]he central question is whether EJA was in the 'business of transporting persons or property for hire by air,' for it is undisputed that neither Texaco nor any of the other participants in the NetJets program were in such a business."[33] After describing the NetJets program in some detail, the court agreed with the Court of Federal Claims that there are

---

[31] Id. at 1464. The transportation tax and the fuel tax for non-commercial aviation are mutually exclusive. See id. at 1465.

[32] Id. at 1467.

[33] Id. at 1469 (quoting 26 U.S.C. § 4041(c)).

-18-

"negligible differences between the NetJets aircraft interchange program and the operation of a commercial air charter business."[34] Because the substance rather than the form of a transaction is generally controlling for tax purposes, the court held that the transportation tax was properly imposed:

> While it is true that Texaco Air held legal title in N111QS [(a Cessna Citation S/II jet aircraft)] to the extent of its fifty percent ownership interest, the agreements which framed the NetJets program placed extensive limitations on the exercise of that interest. At the same time, EJA coordinated all of N111QS' flights with the needs of the other participants in the interchange program and reserved for itself exclusive use of the aircraft for its charter service and for training pilots when the aircraft was not being used by one of its owners. Texaco Air's highly circumscribed ownership interest in N111QS simply was the vehicle through which Texaco Air entered into, and was allowed to participate in, an arrangement pursuant to which it obtained from EJA transportation from one airport to another. We hold that, through its NetJets program, EJA was in the "business of transporting persons or property for hire by air." Accordingly, Texaco Air's flights on N111QS and other interchange aircraft were properly subject to the air transportation tax of IRC § 4261.[35]

The text of the RLA suggests that a similar substance-over-form analysis should apply here. In 1934, Congress amended the RLA and expanded the definition of "carrier" to include carrier affiliates that perform services related to transportation: "The term 'carrier' includes any railroad . . . and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any

---

[34] Id.

[35] Id.

-19-

equipment or facilities or performs any service . . . in connection with the transportation . . . of property . . . by railroad."[36] This focus on the whole entity engaged in transportation indicates that Congress sought "(1) to avoid the possibility that certain employees could interrupt commerce with a strike, and (2) to prevent a carrier covered by the RLA from evading the purposes of the Act by spinning off components of its operation into subsidiaries or related companies."[37]  Title II of the RLA establishes that any consequences flowing from § 151's expansive definition of the term "carrier" apply with equal force to common carriers by air and their employees.[38]  Thus, in the air carrier context, the affiliate prong of the § 151 definition results in RLA coverage for carrier affiliates that do not fly aircraft for the transportation of freight or passengers if their functions are nevertheless related to air transportation.[39]  Here, EJI operates

---

[36] 45 U.S.C. § 151, First.

[37] Verrett v. Sabre Group, Inc., 70 F. Supp. 2d 1277, 1281 (N.D. Okla. 1999).

[38] See 45 U.S.C. § 181 (extending the RLA to common carriers by air); id. § 182 ("The duties, requirements, penalties, benefits, and privileges prescribed and established by the provisions of subchapter I of this chapter, except section 153 of this title, shall apply to said carriers by air and their employees in the same manner and to the same extent as though such carriers and their employees were specifically included within the definition of 'carrier' and 'employee', respectively, in section 151 of this title.").

[39] See, e.g., Verrett, 70 F. Supp. 2d at 1281–83 (holding that a provider of customized management information services and computer reservation services to affiliated and non-affiliated airlines was

aircraft for the transportation of passengers, so the affiliate cases are not entirely applicable.[40]  But because EJI, EJA, and Executive Jet Services are each components of an air transportation program, and the RLA has a "whole entity" focus, we will evaluate the NetJets program to determine whether EJI is a common carrier.

The record reflects that NetJets is marketed on the internet, through direct mail, in business and upscale publications, and at public and quasi-public events.  Despite these marketing efforts, Thibodeaux argues that NetJets does not offer air transportation to individuals or businesses indiscriminately and observes, in support of this argument, that EJI has no regular schedule of flights nor fixed fares for passengers on a per-flight basis.  In Woolsey, however, we found that uniform tariffs and regular flight schedules are not essential characteristics of a common carrier:  "While most common carriers do utilize uniform tariffs applicable to all who apply for service, we agree with the FAA that the absence of tariffs or rate schedules, transportation only pursuant to separately negotiated contracts, or occasional refusals to

_____

a carrier subject to the RLA); District 6, Int'l Union of Indus., Serv., Transp. & Health Employees v. National Mediation Board, 139 F. Supp. 2d 557, 560–62 (S.D.N.Y. 2001) (holding that a catering company under common control with an air carrier is also a carrier subject to the RLA).

[40] Nevertheless, EJI's analogy to its sister EJA is persuasive. Because the companies perform nearly identical operations, and the NMB has asserted jurisdiction over EJA, if this court found that EJI is not a common carrier then the two companies would be subject to different labor-management regimes despite their similarities.

transport, are not conclusive proof that the carrier is not a common carrier."[41]  "What is crucial is that the common carrier defines itself through its own marketing efforts as being willing to carry any member of that segment of the public which it serves."[42]  NetJets clearly satisfies this requirement.  Although its target customers represent a small segment of the general population, the services that NetJets provides are offered indiscriminately to any member of that segment willing to pay for those services.[43]  Thus, NetJets satisfies the "holding out" prong of the Woolsey test.

The final inquiry is whether NetJets constitutes a transportation-for-hire business.  The Federal Circuit answered yes in its assessment of EJA's participation in NetJets, and the similar analysis that applies here leads us to conclude that, through its participation in the NetJets program, EJI is in the business of transporting persons for hire.  A NetJets participant's "highly circumscribed" interest in the aircraft is simply the vehicle through which he obtains transportation from EJI from one

---

[41] Woolsey, 993 F.2d at 524 (internal quotation and citation omitted).

[42] Id.

[43] See id. at 524 n.24 ("Only those carriers who affirmatively hold themselves out to the public, either by advertising or by a course of conduct evincing a willingness to serve members of the general public (or a segment thereof) indiscriminately, so long as they are willing to pay the fee of the carrier, will qualify as common carriers.").

airport to another.[44]

In sum, because EJI "has held itself out . . . to a definable segment of the public as being willing to transport for hire, indiscriminately," it qualifies as a "common carrier" and is therefore subject to Title II of the RLA.[45] And because it is subject to the RLA, EJI's employees are exempt from the overtime provisions of the FLSA.[46]

C.  The "Nonexempt Work" Enforcement Policy—29 C.F.R. § 786.1

Title 29 C.F.R. § 786.1, entitled "Enforcement policy concerning performance of nonexempt work," formalizes the position of the Wage and Hour Division of the Department of Labor that the § 13(b)(3) exemption to the FLSA applies even if an employee performs some "nonexempt" work during the workweek, unless the amount of nonexempt work is "substantial":

> The Division has taken the position that the exemption provided by section 13(b)(3) of the Fair Labor Standards Act of 1938, as amended, will be deemed applicable even though some nonexempt work (that is, work of a nature other than that which characterizes the exemption) is performed by the employee during the workweek, unless the amount of such nonexempt work is substantial. For enforcement purposes, the amount of nonexempt work will be considered substantial if it occupies more than 20 percent of the time worked by the employed during the workweek.[47]

---

[44] Executive Jet Aviation, Inc., 125 F.3d at 1469.

[45] Woolsey, 993 F.2d at 523.

[46] See 29 U.S.C. § 213(b)(3).

[47] 29 C.F.R. § 786.1.

The district court found that even if EJI is a "common carrier by air," the § 13(b)(3) exemption is inapplicable because Thibodeaux's work on Part 91 flights is nonexempt, and this nonexempt work is substantial because it occupies 100% of his workweek. This finding, however, is incorrect.

First, the district court erred by equating nonexempt work with service on flights operated under Part 91. Apart from the fact that § 786.1 does not mention the FAR, by defining "nonexempt work" in relation to the FAA's regulations, the district court overlooked the Department of Labor's definition of that term. "Nonexempt work" is "work of a nature other than that which characterizes the exemption."[48] Section 13(b)(3) of the FLSA exempts employees of air carriers that are subject to the RLA. "In adopting the Railway Labor Act, Congress endeavored to bring about stable relationships between labor and management in this most important national industry."[49] In other words, "[t]he purpose of the restrictive provisions of the Railway Labor Act is to keep transportation moving."[50] It therefore follows that an employee whose work is not directly related to the air transportation activities of his employer performs "work of a nature other than

---

[48] Id.

[49] Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co., 353 U.S. 30, 40 (1957).

[50] Pan Am. World Airways, Inc. v. United Bhd. of Carpenters & Joiners of Am., 324 F.2d 217, 220 (9th Cir. 1963).

-24-

that which characterizes the exemption." Conversely, an employee whose duties are directly related to air transportation performs work that qualifies for coverage under the RLA.[51] In short, the applicability of the § 13(b)(3) exemption depends on both the nature of the employee's duties and the nature of the employer's business—not the FAR.

Second, because the district court did not apply the proper definition of "nonexempt work," it never determined whether Thibodeaux's work is transportation related. This inquiry is an easy one, for Thibodeaux does not argue that the particular duties he performs are unrelated to EJI's transportation activities. Because a flight attendant employed by a common carrier will generally perform work that qualifies for coverage under the RLA, and Thibodeaux has made no showing to the contrary, § 786.1 does not "defeat" Thibodeaux's exemption from the overtime provisions of the FLSA.

## III. CONCLUSION

In granting summary judgment to Thibodeaux, the district court relied too heavily on the Federal Aviation Regulations. The Fair Labor Standards Act and the Railway Labor Act provide the

---

[51] See, e.g., Valdivieso, 305 F.3d at 1287 (11th Cir. 2002) ("Appellants do not dispute that their positions as loadmasters are integral to the transportation of cargo; therefore, these positions are included in the air carrier exemption to the FLSA.").

-25-

substantive law relevant to this dispute.  Because EJI is a "common carrier by air" subject to Title II of the RLA, the FLSA exempts the company's flight attendants from its overtime requirements.  We therefore reverse the district court's judgment and remand this case for the entry of judgment in favor of EJI.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**