SCHALL, Circuit Judge.
 

 Executive Jet Aviation, Inc. (“EJA”) appeals from the judgment of the United States Court of Federal Claims dismissing EJA’s complaint seeking a tax refund. On cross-motions for summary judgment, the court held that EJA was not entitled to a refund of $15,674.60.
 
 Executive Jet Aviation v. United States,
 
 Slip Op. No. 95-7T (March 29, 1996). This sum represents the difference between the total air transportation taxes that were paid pursuant to Internal Revenue Code (“IRC”) § 4261 with respect to certain flights EJA conducted for Texaco Air Services Inc. (“Texaco Air”) and the total taxes that would have been paid had the flights instead been subject to the IRC § 4041(c) fuel tax for noncommercial aviation. We affirm.
 

 BACKGROUND
 

 I.
 

 This case involves a dispute over the interpretation of two mutually exclusive provisions of the Internal Revenue Code concerning the taxation of commercial and noncommercial aviation. Prior to 1970, both commercial and noncommercial flights were subject to a gasoline tax, while commercial flights also were subject to a transportation tax of five percent of the amount paid. 26 U.S.C. §§ 4041(b), 4261(a) (1964 & Supp. V.1970). In 1970, Congress enacted the Airport and Airway Revenue Act, Pub.L. No. 91-258, 84 Stat. 219, 236. It did so in order to finance anticipated
 
 *1465
 
 growth in demand for air transportation by increasing the tax rate on commercial aircraft users and by adding a new tax for noncommercial aviation users. H.R.Rep. No. 91-601, at 35-36 (1969),
 
 reprinted in
 
 1970 U.S.C.C.A.N. 3047, 3082. Noncommercial flights were made subject only to gasoline and nongasoline fuel taxes, 26 U.S.C. § 4041(c), while commercial flights were made subject only to an air transportation tax, calculated as a percentage of the fee charged for the transportation, 26 U.S.C. § 4261.
 
 Id.
 

 During the relevant period of time, IRC § 4261 imposed upon “the amount paid for taxable transportation (as defined in section 4262) of any person a tax equal to 10 percent of the amount so paid.” 26 U.S.C. § 4261 (Supp.V.1993). “Taxable transportation” is “transportation by air which begins in the United States or in the 225-mile zone and ends in the United States or in the 225-mile zone.” 26 U.S.C. § 4262(a)(1) (1988).
 
 [1]
 
 IRC § 4041(c), on the other hand, provides for a per-gallon retail excise tax for fuels used in an aircraft in “noncommercial aviation.” 26 U.S.C. § 4041(c). Under IRC § 4041(c)(4), “noncommercial aviation” is defined as “any use of an aircraft, other than use in a business of transporting persons or property for compensation or hire by air.” This section also specifies that the term “noncommercial aviation” includes any use of an aircraft that is exempt from taxes imposed by section 4261.
 
 Id.
 

 II.
 

 The pertinent facts are not in dispute. EJA is an aircraft management and air charter service company. At issue in this case is its “NetJets” program. During the period April 1, 1993, to September 20, 1993, the program provided participants with air transportation and aircraft maintenance services. The program served parties who had the need for exclusive use of a corporate aircraft but who did not need the aircraft on a full-time basis.
 

 A party wishing to become a NetJets participant was required to own or lease an interest in an aircraft. Fractional interests ranged from one-eighth to seven-eighths. Most NetJets participants purchased or leased their interests from Executive Jet Sales, Inc. (“EJS”), a wholly-owned subsidiary of EJA. When entering the NetJets program in this manner through a purchase, a participant would enter into a Purchase Agreement with EJS. Pursuant to the Purchase Agreement, on the closing date, EJS would transfer to the participant the specified interest in the subject aircraft by conveying a bill of sale. As a condition precedent to closing, the participant was required to enter into a Management Agreement with EJA, an Owners Agreement with the party or parties holding additional interests in the aircraft, and a Master Interchange Agreement with EJA (the “Interchange Agreement”). Under the Purchase Agreement, the participant agreed not to sell or otherwise transfer its interest in the aircraft— except to an affiliate — without the prior written consent of EJS, so long as the aircraft was being operated under the terms of the Management Agreement, the Owners Agreement, and the Interchange Agreement. The giving of such consent was, among other things, contingent upon the “New Purchaser” assuming all of the participant’s obligations under the above three agreements.
 

 With the Purchase Agreement, the Management Agreement, the Owners Agreement, and the Interchange Agreement in place, a participant in the NetJets program was entitled to share flight time per year in a subject aircraft based on its percentage of ownership in the aircraft. The aircraft would be maintained, fueled, hangared, and insured by EJA, with pilots being selected by EJA.
 

 Pursuant to the Management Agreement, EJA assumed full responsibility for maintenance and operation of the aircraft. At its own cost and expense, EJA was required to inspect, service, repair, overhaul, and test the aircraft in order to maintain it in the condition required to maintain its air-worthiness certification from the Federal Aviation Administration (“FAA”). EJA also agreed to repaint the exterior and refurbish the interi-
 
 *1466
 
 or of the aircraft, as often as it deemed necessary, in order to maintain the aircraft in accordance with the standards of EJA’s fleet of aircraft. In addition, EJA was required to maintain all records, logs, and other materials required by the FAA to be maintained with respect to the aircraft. EJA further agreed to pay for fuel and to pay the salary and the travel and lodging expenses of the crew. It also agreed to pay hangar and tie-down costs, landing fees, in-flight food and beverages expenses, and the expenses of flight planning and weather contract services. EJA also was required to provide a pool of professionally qualified pilots who were licensed to operate the aircraft. However, a participant did have the right to remove a pilot and designate new pilots from the pool. Alternatively, a participant could substitute its own pilots upon 24 hours prior notice to EJA, provided that the pilots met EJA’s suitability requirements. Finally, EJA agreed to obtain, at its expense, all-risk aircraft hull insurance and liability insurance with respect to the aircraft.
 

 In return for the services to be provided by EJA under the Management Agreement, a participant in the NetJets program agreed to pay EJA a monthly management fee and an occupied hourly rate charge commensurate with actual flight time. The participant further agreed to allow EJA to use the aircraft when it was not otherwise in use, so that EJA could provide air transportation service to the public and flight training for its pilots. EJA was entitled to keep all money earned from providing air transportation service to the public. Although a participant in the NetJets program had the right to inspect the aircraft and all EJA’s records concerning the aircraft, it was not permitted to place its own insignia on either the exterior or interior of the aircraft. The Management Agreement had a term of five years.
 

 The Owners Agreement with respect to an aircraft stated each participant’s percentage of ownership in the aircraft and recited that the relationship of the applicable participants with respect to the aircraft was that of tenants-in-eommon of a chattel. Pursuant to the Owners Agreement, each participant agreed to maintain its interest in the subject aircraft for at least the duration of a specified term. In addition, a participant could only divest itself of its interest in the aircraft by transferring the interest to a buyer who would execute the Owners Agreement. In the Owners Agreement, each participant acknowledged that it had given EJS the right to repurchase its interest in the aircraft in the event of a default by it under the Management Agreement. As far as usage was concerned, the Owners Agreement provided that no participant could utilize the aircraft in excess of its available flight hours — determined based upon its percentage of ownership in the aircraft — without incurring a surcharge. The Owners Agreement also prohibited use of the aircraft outside of the contiguous 48 states of the United States, Mexico, Canada, and portions of the Caribbean Islands without EJA’s prior consent.
 

 The Interchange Agreement was the third agreement that each participant in the NetJets program executed upon purchasing an interest in an aircraft covered by the program. The Interchange Agreement recited that participants in the NetJets program who were owners of “a Program Aircraft” wished to engage EJA to provide administrative services to enable such owners to participate in an interchange arrangement. The Interchange Agreement further recited that the owners of the Program Aircraft wished to participate in the NetJets program by sharing their aircraft with other participants and by using Program Aircraft provided by other participants in the program. The Interchange Agreement provided that each owner was entitled to the use of another Program Aircraft, on an as available, first come, first served basis, if the owner was unable to use the aircraft in which it owned an interest. No charge was levied for using another aircraft unless the substitute aircraft was of a different make and model and was requested by the owner. In such a case, the differential in the cost of owning, operating and maintaining the aircraft was assessed and charged against the owner’s unused flight hours for the year in question in its aircraft.
 

 On June 25, 1992, Texaco Air, a wholly-owned subsidiary of Texaco Inc., entered into a Purchase Agreement with EJS in order to
 
 *1467
 
 acquire a 50-percent undivided interest in a Cessna Citation Model S/II fixed-wing jet aircraft, bearing FAA registration number N111QS. It did so in order to become a participant in the NetJets program. Texaco Air also entered into the Management Agreement, the Owners Agreement, and the Interchange Agreement. Under its Management Agreement with EJA, Texaco Air was entitled to use N111QS or any other interchange aircraft, or up to four aircraft at a time, for an average of 400 hours per year, or a maximum of 2000 hours over the five-year term of the agreement. From March 1,1993 until August 31, 1998, Texaco Air used both N111QS and also other interchange aircraft. In accordance with the Management Agreement, Texaco Air paid EJA a monthly fee of $22,429 and a fee of $1060 per flight hour.
 

 Until April 1, 1993, EJA paid the IRC § 4041(c) fuel tax with respect to fuel consumed on Texaco Air’s flights on N111QS and other interchange aircraft. The Internal Revenue Service (“IRS”) concluded, however, that through its NetJets program, EJA was providing commercial transportation that was taxable under IRC § 4261. The IRS computed the tax that was due for Texaco Air’s flights based upon the hourly- rate of $1060 that EJA charged Texaco Air for each hour of flight time. No transportation tax was assessed with respect to the monthly fee that Texaco Air paid whether or not it utilized interchange aircraft. EJA collected the air transportation tax from Texaco Air for the second and third calendar quarters of 1993 and remitted it to the IRS. Thereafter, it filed refund claims in the total amount of $15,674.60. This sum represented the difference between the IRC § 4261 transportation tax which the IRS required EJA to pay with respect to NetJets program flights by Texaco Air between April 1 and August 31, 1993, and the IRC § 4041(c) fuel tax EJA had paid for such flights. The refund claims were disallowed on April 26, 1994.
 

 On May 18, 1994, EJA filed a complaint in the Court of Federal Claims seeking to recover the amount of its refund claim. On cross-motions for summary judgment the court determined that the NetJets program operated in substantially the same way as a commercial air charter business, where Texaco Air contracted with EJA for transportation services. Therefore, the court concluded, EJA was involved in the business of providing transportation “for compensation or hire” whenever Texaco Air utilized N111QS or another interchange aircraft. Accordingly, the court granted the government’s motion for summary judgment and denied EJA’s cross-motion. This appeal followed.
 

 DISCUSSION
 

 Pursuant to Rule 56 of the Court of Federal Claims, summary judgment is properly granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56. In this case, there is no genuine issue as to any material fact. The sole issue before us is whether the Court of Federal Claims erred, as a matter of law, in holding that the flights which EJA conducted for Texaco Air from April 1, 1993, through August 31, 1993, constituted “taxable transportation” for hire by air under IRC § 4261. The court’s holding turned on its interpretation of the NetJets program, as framed by the Purchase Agreement, the Management Agreement, the Owners Agreement, and the Interchange Agreement. The interpretation of these agreements and the application of the undisputed facts of this case to the Internal Revenue Code are conclusions of law which we review
 
 de novo. Washington Energy Co. v. United States,
 
 94 F.3d 1557, 1560 (Fed.Cir.1996);
 
 see Kane v. United States,
 
 43 F.3d 1446, 1448 (Fed.Cir.1994);
 
 Reese v. United States,
 
 24 F.3d 228, 230 (Fed.Cir. 1994).
 

 EJA argues that, in order for Texaco Air’s flights to have been subject to the § 4261 transportation tax, EJA had to provide the means for conveyance — either Nil IQS or another interchange aircraft. EJA disclaims any argument that it had to own the aircraft in order to provide taxable transportation. Rather, it contends that “providing services that facilitate the use of an aircraft by the person who does own it or has an independent right to use it [ (i.e., Texaco Air) ] does not constitute a business of transportation.” EJA supports its argument by urging that, as used in IRC §§ 4261 and 4041(c) the
 
 *1468
 
 words “transportation” and “transporting” connote “systems and modes of conveyance of persons or goods from place to place.”
 
 Webster’s New International Dictionary
 
 2694 (2d ed.1941). EJA recognizes that there are other definitions of “transportation” and “transporting.” It argues, however, that sections 4041(c) and 4261 are ambiguous because they do not define the terms. Thus, EJA argues, there comes into play the holding in
 
 Gould v. Gould,
 
 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211 (1917), that ambiguity in a tax statute must be resolved in favor of the taxpayer.
 

 Armed with its construction of the statutory scheme, EJA asserts on appeal that the Court of Federal Claims erred in concluding that Texaco Air’s flights from April 1 through August 31, 1993, were subject to the § 4261 transportation tax. It contends that, on each of the flights at issue, Texaco Air was either the owner of the aircraft on which it flew or the lessee of the aircraft from the aircraft’s owners through the Interchange Agreement. Under these circumstances, EJA asserts, its only role with respect to each of the flights was that of an aircraft manager. It simply made certain that any aircraft that Texaco Air used was properly maintained, serviced, fueled, and otherwise ready to fly. It also made certain that qualified pilots were available to participants in the NetJets program who wished to use them. Finally, EJA argues that, in any event, Congress did not intend that the air transportation tax apply to flights like those in this ease that it undertook for Texaco Air.
 

 We begin our analysis with the language of the statute.
 
 Zenith Elec. Corp. v. United States,
 
 77 F.3d 426, 430 (Fed.Cir. 1996). Where the statute’s language is plain, “the sole function of the courts is to enforce it according to its terms.”
 
 United States v. Ron Pair Enterprises, Inc.,
 
 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (citing
 
 Caminetti v. United States,
 
 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). We do not agree that IRC §§ 4261 and 4041(c) are ambiguous because they do not define the words “transportation” and “transporting.” It is well settled that the legislature’s failure to define commonly-used terms does not create ambiguity, because the words in a statute “are deemed to have their ordinarily understood meaning.”
 
 Koyo Seiko Co. v. United States,
 
 36 F.3d 1565, 1571 n. 9 (Fed.Cir.1994);
 
 see also Electronic Sys. Assocs., Inc. v. United States,
 
 895 F.2d 1398, 1400 (Fed.Cir.1990) (words in a statute are to be given their “plain and ordinary meaning unless there is clear congressional intent to the contrary”);
 
 Thompson/Center Arms Co. v. United States,
 
 924 F.2d 1041, 1044 (Fed. Cir.1991);
 
 aff'd,
 
 504 U.S. 505, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992). Moreover, “[t]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and ... ingenuity and study ... would discover.”
 
 Lynch v. Alworth Stephens Co.,
 
 267 U.S. 364, 370, 45 S.Ct. 274, 275, 69 L.Ed. 660 (1925).
 

 The critical statutory provision is IRC § 4041(c). Through it, commercial aviation, which is subject to the § 4261 transportation tax, is defined as “any use of an aircraft ... in a business of transporting persons or property for compensation or hire by air.” The dictionary definition of “use” is “the act or practice of using something.”
 
 Webster’s Third New International Dictionary
 
 2523 (1986). A “business” is defined as “a commercial or industrial enterprise.”
 
 Id.
 
 at 302. As far as “transporting” is concerned, it is a form of the verb “transport.” The first definition which appears in the dictionary for “transport” is “to transfer or convey from one person or place to another.”
 
 Id.
 
 at 2430. We believe that this is the most “plain, obvious and rational” definition of “transport.”
 
 [2]
 

 We reject E JA’s argument that it was necessary for it to provide aircraft to Texaco Air by being an owner or lessor in order for Texaco Air’s flights under the NetJets program to be subject to the transportation tax. Neither the definitions of the words used in the statute nor the overall construction of the statute supports such a conclusion.
 

 What we must determine then is whether, based upon the correct reading of the statute, the Texaco Air flights that are at issue involved “use of an aircraft ... in a
 
 *1469
 
 business of transporting persons or property for compensation or hire by air.... ” 26 U.S.C. § 4041(c). The central question is whether EJA was in the “business of transporting persons or property for hire by air,” for it is undisputed that neither Texaco nor any of the other participants in the NetJets program were in such a business. In our view, as far as the NetJets program was concerned, EJA was in the “business of transporting persons or property for hire by air.” Consequently, the transportation tax was properly imposed.
 

 As noted, EJA argues that its role with respect to each of the flights was simply that of an aircraft manager for those who owned or leased interests in aircraft. We disagree. The NetJets program, which was administered and run by EJA, served parties like Texaco Air who were interested in acquiring flight time, not an ownership or a leasehold interest in a corporate aircraft. One could become a NetJets participant by acquiring only a one-eighth interest in an aircraft, and while in the interchange program, a participant might never actually fly aboard the aircraft in which it had purchased an interest. At the same time, at its own expense, EJA was required to inspect, service, repair, overhaul, and test the aircraft in order to maintain its FAA certification. EJA further agreed to pay for fuel and to pay the salary and the travel and lodging expenses of the crew. It also agreed to pay hangar and tie-down costs, landing fees, and in-flight food and beverage expenses. Finally, EJA agreed to obtain, at its own expense, all-risk aircraft hull insurance and liability insurance.
 

 While it is true that Texaco Air was a fifty percent owner of N111QS, its ownership interest was highly fettered. To begin with, in order to purchase its interest in the first place, Texaco Air had to enter into the Management Agreement, the Owners Agreement, and the Interchange Agreement. It also had to agree that, so long as N111QS was being operated under those agreements, it would not sell or otherwise transfer its interest in the aircraft — except to an affiliate — without the prior written consent of EJS. Furthermore, any buyer had to agree to assume Texaco Air’s obligations under each of the above three agreements. In addition, together the Management Agreement, the Owners Agreement, and the Interchange Agreement served to significantly restrict Texaco Air’s day-to-day use of N111QS. Thus, N111QS was painted in the NetJets colors, and Texaco Air was not allowed to customize it or identify it with its corporate logo. In addition, Texaco Air incurred a surcharge when it used the aircraft for more than its allotted number of hours, and it was prohibited from using the aircraft outside of certain specified geographic areas without EJA’s prior consent. Finally, EJA reserved for itself exclusive use of N111QS for its charter service and for training its pilots when the aircraft was not being used by Texaco Air and its other owners.
 

 The Court of Federal Claims stated that it detected “negligible differences between the NetJets aircraft interchange program and the operation of a commercial air charter business.” We agree. “It has been recognized that for tax purposes the substance rather than the form of a transaction is generally controlling.”
 
 Terry Haggerty Tire Co., Inc. v. United States,
 
 899 F.2d 1199, 1201 n. 2 (Fed.Cir.1990);
 
 Gregory v. Helvering,
 
 293 U.S. 465, 470, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). While it is true that Texaco Air held legal title in N111QS to the extent of its fifty percent ownership interest, the agreements which framed the NetJets program placed extensive limitations on the exercise of that interest. At the same time, EJA coordinated all of Nil IQS’ flights with the needs of the other participants in the interchange program and reserved for itself exclusive use of the aircraft for its charter service and for training pilots when the aircraft was not being used by one of its owners. Texaco Air’s highly circumscribed ownership interest in N111QS simply was the vehicle through which Texaco Air entered into, and was allowed to participate in, an arrangement pursuant to which it obtained from EJA transportation from one airport to another. We hold that, through its NetJets program, EJA was in the “business of transporting persons or property for hire by air.” Accordingly, Texaco'Air’s flights on N111QS and other interchange aircraft were properly subject, to the air transportation tax of IRC § 4261.
 

 
 *1470
 
 Finally, as noted, EJA argues that Congress did not intend that the air transportation tax apply to flights such as Texaco Air’s. In making this argument, EJA points to certain legislative history. It notes that Congress adopted the air transportation tax to “provide additional revenue” for financing “expansion and development of the airport and airway system.”
 
 See
 
 H.R.Rep. No. 91-601, at 38 (1969),
 
 reprinted in
 
 1970 U.S.C.C.A.N. 3047, 3083. EJA asserts that Congress intended to obtain “most of the additional tax revenue from passenger and freight ticket taxes,” for “three primary” reasons: (i) there was already an administrative system in place; (ii) the tax would increase with demands on the airports that the tax supports; and (iii) ticket prices were “related to the distance traveled and the cost per mile of air operation.”
 
 See
 
 H.R.Rep. No. 91-601, at 39,
 
 reprinted in
 
 1970 U.S.C.C.A.N. at 3084.
 

 EJA states that the rationale articulated in the legislative history “is not apposite to the flights in issue.” This is so, EJA asserts, because, except for a portion of the occupied hourly rate charge, the fees Texaco Air paid EJA were in large part unrelated to the distance traveled and cost per mile of air operations, the fees being geared largely to the costs of owning and maintaining the aircraft, whether or not it was used. Thus, EJA reasons that “the tax to Texaco Air would increase not just with the usage of airways and airport facilities, but primarily with the costs of owning and maintaining aircraft,” which would be contrary to the rationale for the tax indicated by the legislative history.
 

 We reject this argument. “[Ajbsent a clear showing of contrary legislative intent, the plain meaning analysis of the statutory language begins and ends the judicial inquiry.”
 
 MCI Telecomms. Corp. v. United States,
 
 878 F.2d 362, 365 (Fed.Cir.1989);
 
 see Madison Galleries, Ltd. v. United States,
 
 870 F.2d 627, 629 (Fed.Cir.1989). In any event, we do not believe that the legislative history helps EJA. We do not read the legislative history to which EJA points as indicating that liability for the transportation tax is contingent upon whether the fee paid is “related to the distance traveled and the cost per mile of air operations.” Moreover, the tax imposed on EJA’s fee of $1,060 per occupied hour is a charge for air travel, which is directly related to the distance traveled. The greater the distance that a NetJets participant travels correlates with a greater number of hours for which the participant is charged.
 

 CONCLUSION
 

 For the foregoing reasons, the judgment of the Court of Federal Claims is affirmed.
 

 COSTS
 

 Each party shall bear its costs.
 

 AFFIRMED
 

 [1]
 

 . The statute defines the "225-mile zone” as "that portion of Canada and Mexico which is not more than 225 miles from the nearest point in the continental United States.” 26 U.S.C. § 4262(c)(2) (1988).
 

 [2]
 

 . Since the statute is not ambiguous,
 
 Gould v. Gould
 
 is not applicable.