FISHER & COMPANY, INC v DEPARTMENT OF TREASURY

Docket Nos. 280476 and 280498. Submitted January 6, 2009, at Lansing. Decided January 29, 2009, at 9:05 a.m.

Fisher & Company, Inc., brought an action in the Court of Claims against the Department of Treasury, seeking a refund of use taxes paid under protest with regard to the plaintiff's purchase in North Carolina of a partial interest in an airplane. The purchase was pursuant to an agreement whereby the multiple owners shared maintenance, administration, and access to their respective airplanes and in return received transportation on the other airplanes in the fleet maintained by the seller's sister company. The airplane co-owned by the plaintiff never entered Michigan; however, the plaintiff did utilize within Michigan the benefit of transportation on the other airplanes in the fleet. The Court of Claims, William E. Collette, J., granted summary disposition in favor of the defendant, ruling that the transaction constituted a purchase of tangible personal property rather than services and that the plaintiff used its property in the state of Michigan within the meaning of the Use Tax Act, MCL 205.91 *et seq*. The Court of Claims also determined that under MCL 205.94(1)(e) the plaintiff was entitled to a refund of three percent of the use tax it paid because it had paid sales tax to North Carolina, which imposed a sales tax at the "rate of three percent" up to a maximum of $1,500. Both parties appealed, and the appeals were consolidated.

The Court of Appeals *held*:

The Court of Claims properly determined that the transaction constituted a purchase of tangible personal property rather than services and that the plaintiff used the property in the state within the meaning of the Use Tax Act.

Affirmed.

DAVIS, J., stated that the nature of the transaction constituted a purchase of tangible personal property rather than services and that the plaintiff used the property in the state within the meaning of the Use Tax Act. However, the amount of the refund to which the plaintiff is entitled should be limited to the $1,500 in sales tax actually paid in North Carolina. Taxpayers are not entitled to credits or refunds for money they have not actually paid. The order

of the Court of Claims should be affirmed in part and reversed in part, and the case should be remanded to the Court of Claims for further proceedings as the Court of Claims deems necessary.

MURRAY, P.J., stated that the nature of the transaction constituted a purchase of tangible personal property rather than services and that the plaintiff used the property in the state within the meaning of the Use Tax Act. The Court of Claims did not err in determining that the North Carolina tax rate of three percent of the purchase price should be deducted from the plaintiff's Michigan use tax liability. The order of the Court of Claims should be affirmed.

O'CONNELL, J., dissenting, stated that when the transaction is analyzed using the "incidental to services" test set forth in *Catalina Marketing Sales Corp v Dep't of Treasury*, 470 Mich 13 (2004), it is clear that the plaintiff purchased transportation services, not tangible personable property, and is not subject to the Michigan use tax. The order of the Court of Claims should be reversed.

*Honigman Miller Schwartz and Cohn LLP* (by *June Summers Haas, Angela M. Brown*, and *Angela Emlet-Dardas*) for the plaintiff.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Michael R. Bell*, Assistant Attorney General, for the defendant.

Before: MURRAY, P.J., and O'CONNELL and DAVIS, JJ.

DAVIS, J. Each of the parties separately appealed as of right the same summary disposition order. We consolidated the appeals. This case involves a dispute between the parties regarding the applicability of the Michigan Use Tax Act (UTA), MCL 205.91 *et seq.*, to plaintiff's purchase of a partial interest in an aircraft. The Court of Claims held that the nature of the transaction constituted a purchase of tangible personal property rather than services, but it also held that plaintiff was entitled to a refund of three percent. I would affirm in part, reverse in part, and remand.

The parties do not dispute the bare facts, although, as will be evident later, the legal implications of those facts are not so straightforward. Plaintiff is a Michigan corporation. It purchased a "25% undivided interest" in a small turbofan jet airplane.[1] That partial interest was formally considered to be a tenant-in-common owner-ship interest, along with several other part owners; plaintiff was designated as the "buyer." Each part owner, including plaintiff, was entitled to share in the airplane's depreciation, gain, loss, deduction, or other tax benefit that might arise therefrom. The seller's sister company, NetJets Aviation, Inc., (NJA), main-tained the airplane and coordinated its use by plaintiff and by the other part owners, and the "owner's agree-ment" precluded plaintiff from placing any lien on the airplane without approval by the maintenance entity. The airplane was specifically identified, and that par-ticular airplane never entered Michigan. However, part of the benefit to plaintiff was the use of other airplanes in the NJA fleet, consistent with plaintiff's rights under the six "operative documents" that made up the trans-action.[2] Plaintiff did utilize that benefit for transporta-tion in Michigan.

The Use Tax Act is complementary to the Michigan General Sales Tax Act, MCL 205.51 *et seq.*, and is designed to cover those transactions not subject to the sales tax. *Sharper Image Corp v Dep't of Treasury*, 216 Mich App 698, 701; 550 NW2d 596 (1996). This tax is

---

[1] It purchased an interest in one airplane from Executive Jet Sales, Inc. (EJS), in 2001, and in 2003 it then traded that interest for another interest in a different airplane from NetJets Sales, Inc. (NetJets). We are only concerned with the 2003 transaction, because the subject of this dispute is the use tax plaintiff paid regarding the 2003 contract.

[2] These documents consisted of the purchase agreement, the owner's agreement, an interchange agreement, a management agreement, an acceptance form, and a bill of sale.

collectable from each taxpayer in Michigan and is assessed "for the privilege of using, storing, or consuming tangible personal property in this state at a rate equal to 6% of the price." MCL 205.93(1). " ' "A sales-use tax scheme is designed to make all tangible personal property, whether acquired in, or out of, the state subject to a uniform tax burden. Sales and use taxes are mutually exclusive but complementary, and are designed to exact an equal tax based on a percentage of the purchase price of the property in question." ' " *By Lo Oil Co v Dep't of Treasury*, 267 Mich App 19, 52; 703 NW2d 822 (2005), quoting *Catalina Marketing Sales Corp v Dep't of Treasury*, 470 Mich 13, 19 n 3; 678 NW2d 619 (2004), quoting 85 CJS2d, Taxation, § 1990, p 950.

Critically, the use tax applies, by its plain language, to *tangible personal property*. It does not apply to services. The most significant issue in this case is whether plaintiff *actually* purchased an *actual* airplane (albeit as a co-owner). Plaintiff argues that it only purchased "nominal" title. Rather, it claims that the "purchase" was merely a convenient way to express plaintiff's purchase of a particular number of hours of flight time to be provided by a corporate travel services provider. Indeed, plaintiff argues that this was the only way the provider would permit a purchase of more than 200 hours of flight time to be structured. Moreover, plaintiff stresses the fact that, once all the required transaction documents were executed, plaintiff's practical rights to the airplane fell far short of anything a lay person would recognize as "ownership." Defendant argues that the contractual documents all reflect a purchase of the airplane itself, albeit only as a part owner, and further points out that plaintiff actually did, in fact, claim depreciation for the airplane on its taxes. Defendant does not seem to dispute that some services were involved in the transaction, but it asserts that the partial purchase of the airplane itself was a fundamental

part thereof. Furthermore, defendant points out that contracting to relinquish control over something is itself the exercise of an ownership right.

We appreciate the fact that, at the end of the day, plaintiff ultimately just wanted to have on-demand corporate jet transportation without the need to purchase and maintain a whole airplane. However, the dispositive issue is not so much plaintiff's motivation as what *actual transaction* plaintiff entered into. The documents involved all reflect a sale of an ownership interest in an airplane, coupled with a contractual arrangement under which multiple airplane owners shared maintenance, administration, and access to their airplanes. In effect, this is a time share in an item of tangible personal property; in this case, an airplane.

Traditionally, time shares involve real property, where "a purchaser would buy occupancy rights in one or more week-long 'intervals,' along with a corresponding undivided interest in the property . . . [a]s is typical in time-sharing arrangements, interval owners could place their occupancy rights in commercial pools that facilitate trades with those who have occupancy rights in homes at other resorts." *O'Connor v Resort Custom Builders, Inc,* 459 Mich 335, 338; 591 NW2d 216 (1999).[3] The airplane fleet involved in this case appears to be precisely such a commercial-pool time share.

The transaction involved was, therefore, a purchase of tangible personal property coupled with a contract controlling how that personal property would be used. The fact that plaintiff has contracted away some (or even

---

[3] In that case, our Supreme Court concluded that a week-long time share did not really constitute a residential purpose because of the lack of permanence, or at least the right for owners to come whenever they want to. It did not suggest in any way that a time share was not a real ownership interest.

most) of its practical control over its airplane does not preclude plaintiff from having purchased it. It is therefore clear that there was a transfer of tangible personal property and a contemporaneous but nevertheless separate . contract for services involving that property.

Plaintiff further argues that the use tax does not apply because even if it purchased tangible personal property in the form of an interest in the airplane, the airplane was not used "in this state" because it never entered this state. We note that, under MCL 205.93(1)(a), it will be presumed that property is intended for use in this state if it is brought into the state within 90 days of purchase. However, that provision only sets forth a presumption. More importantly, "use" is defined very broadly by MCL 205.92(b) as "the exercise of a right or power over tangible personal property incident to the ownership of that property including transfer of the property in a transaction where possession is given." Thus, "use" in the context of the UTA is not limited to physical actions performed directly on the property. It includes any exercise of a right that one has to that property by virtue of having an ownership interest in it. Something need not necessarily be physically present in Michigan for it to be "used" in Michigan.

We are persuaded that plaintiff "used," within the meaning of the UTA, its fractional ownership interest in the airplane in Michigan. The right to control what happens—in layman's terms—to one's property is one of the most fundamental rights incident to ownership. *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 534-535; 676 NW2d 616 (2004); see also *People v Gallagher*, 4 Mich 244, 262 (1856) (PRATT, P.J., dissenting).[4] Entering into a

---

[4] The *Gallagher* case involved a challenge to the "prohibitory liquor law" of 1855. The majority in *Gallagher* did not dispute Justice PRATT's point, but rather held that the courts could only declare a legislative enactment void if it is unconstitutional, not for violating "natural rights."

contract to give up some of one's rights to possession or control is, itself, an exercise of those rights. It would be an exercise of an ownership right for a person in a time share pooling arrangement to use someone else's share in exchange for that person's own share. We conclude that plaintiff's use of *any* airplane in the fleet at issue was *pursuant to* its contracts to share ownership rights to its own airplane. Therefore, we conclude that plaintiff "used" its property in Michigan within the meaning of the UTA.

We therefore affirm the ruling of the Court of Claims that the transaction entailed a transfer of tangible personal property to which the use tax applied by virtue of its use in this state.

However, I would hold that the Court of Claims erred in calculating the amount of the tax refund to which plaintiff was entitled. Pursuant to MCL 205.94(1)(e):

> If the sale or use of property was already subjected to a tax under the law of any other state or local governmental unit within a state in an amount less than the tax imposed by this act, this act shall apply, but at a rate measured by the difference between the rate provided in this act and the rate by which the previous tax was computed.

The relevant purchases were made in North Carolina, which imposed a sales tax at the "rate of three percent" up to a maximum of $1,500. NC Gen Stat § 105-164.4(a)(1b) (2008). The UTA does not specifically address the implications of an out-of-state purchase where the amount of sales or use tax collected has a cap.

Nevertheless, I find the intent of the Legislature clear: as discussed above, the UTA is part of the Legislature's scheme to impose a uniform and equal tax burden. *By Lo Oil Co, supra* at 52. In that context, MCL 205.94(1)(e) is clearly designed to ensure that a taxpayer is only liable for the use tax to the extent the

taxpayer has not already remitted to a sister state the sister state's own sales or use tax. The word "rate" is undefined in the UTA, I therefore turn to the dictionary.

According to the *Random House Webster's College Dictionary* (2001), "rate" means "the amount of a charge or payment with reference to some basis of calculation"; it can also mean, in relevant part, "a certain amount of one thing considered in relation to a unit of another thing" or "a fixed charge per unit of quantity." Black's Law Dictionary (8th ed) defines "rate" either as "the proportion by which quantity or value is adjusted" or "[a]n amount paid or charged for a good or service." Any of these definitions, however, would produce the same result: both the proportional amount and the absolute amount of sales tax paid in North Carolina was $1,500. Black's Law Dictionary defines the more specific term "tax rate" as "[a] mathematical figure for calculating a tax, usu. expressed as a percentage." Although this latter definition could support the view that only the three percent calculation should be considered, that view would be inconsistent with the known purpose of Michigan's statute: taxpayers are not entitled to credits or refunds for money they have not actually paid.

Therefore, I would include North Carolina's sales tax cap in our computation of plaintiff's refund entitlement in order to give effect to the *entirety* of both North Carolina's statute and our own. And, finally, this is the only way to accomplish the Legislature's goal of making the tax burden uniform. Plaintiff was entitled to a refund of $1,500 because that sum was "the rate by which the previous tax was computed."

The holding of the Court of Claims that the UTA applies to the transactions at issue should be affirmed. The computation by the Court of Claims of the amount

of refund to which plaintiff was entitled should be reversed. I would remand for further proceedings as the Court of Claims deems necessary. We do not retain jurisdiction. No costs, a public question being involved.

MURRAY, P.J. (*concurring in part and dissenting in part*). I concur in Judge DAVIS's opinion to the extent it concludes that the transactions at issue primarily constitute a purchase of tangible personal property rather than services. In my view, and as espoused in Judge DAVIS's opinion, plaintiff Fisher & Company, Inc., purchased an ownership interest in the aircraft and then exercised that right of ownership in signing and agreeing to the terms set forth in the owner's agreement, management agreement, and other related agreements. However, I disagree with Judge DAVIS's conclusion that the Court of Claims erred in calculating the amount of tax refund to which plaintiff was entitled. Accordingly, I disagree with the part of Judge DAVIS's opinion where he states that, under MCL 205.94(1)(e), plaintiff was entitled to only deduct the cap of $1,500 under the North Carolina statute from the amount owed to Michigan.

As our courts have repeated since they were established in the 1800s, our focus in interpreting statutes is to discern and give effect to the intent of the Legislature as found in the statutes' plain language. *Houdek v Centerville Twp*, 276 Mich App 568, 581; 741 NW2d 587 (2007). When, as in this case, a term or phrase is undefined by the Legislature and has a peculiar meaning under the law, we resort to a legal dictionary to help determine its meaning. See *Vodvarka v Grasmeyer*, 259 Mich App 499, 510; 675 NW2d 847 (2003).

As noted in Judge DAVIS's opinion, MCL 205.94(1)(e) provides that for those sales or uses of property that

were already taxed by another state, the Michigan use tax is subject to "a rate measured by the difference between the rate provided in this act and the rate by which the previous tax was computed." The North Carolina sales tax statute to which plaintiff's ownership interest was taxed provides for a "rate of three percent," but also contains a maximum cap of $1,500. NC Gen Stat § 105-164.4(a)(1b) (2008). According to Black's Law Dictionary (7th ed), "tax rate" is defined as "[a] mathematical figure for calculating a tax, usu. expressed as a percentage." Utilizing this definition, the tax rate, i.e. the mathematical figure used for calculating a tax, was three percent under the North Carolina statute. Accordingly, three percent is the "rate by which the previous tax was computed." The fact that the North Carolina legislature included a cap for larger purchases does not change the fact that the "tax rate" utilized in North Carolina is three percent.

Utilization of caps or similar tax schemes is not uncommon, and our Legislature could have indicated in the Michigan use tax statute that it would be subject to any cap or that the Michigan liability would be reduced by whatever amount was actually paid by the taxpayer in another state. However, the Legislature was not that specific and instead used the phrase "tax rate," which under the dictionary and common parlance means the percentage used to calculate a tax. As indicated, that was three percent under the North Carolina statute; therefore, three percent of the purchase price should be deducted from plaintiff's Michigan use tax liability.

O'CONNELL, J. (dissenting). I respectfully dissent, because I believe that plaintiff Fisher & Company, Inc. (Fisher), purchased transportation services, not tangible personal property. Therefore, I would hold that Fisher should not be subject to Michigan's use tax.

In my opinion, the majority errs when it attempts to fit this transaction under the definition of a "sale of goods" so the transaction can be taxed under the Michigan Use Tax Act, MCL 205.91 *et seq.* Instead, this panel should accept this transaction for what it really is: a sale of transportation services. Admittedly, Fisher signed an agreement to "purchase" a 25-percent interest in an airplane from NetJets Sales, Inc. (NetJets). However, this purchase agreement cannot be divorced from the larger contractual agreement that Fisher and NetJets entered into and the purpose of this agreement. Fisher's intent in entering into this contract was not to own part of an airplane; in fact, Fisher never used the airplane of which it was technically a partial owner. Instead, Fisher wanted NetJets to provide it with transportation services, and Fisher's acquisition of partial ownership of one of the jets in the NetJets fleet was one aspect of the overall agreement that NetJets required Fisher to enter into in order to receive transportation services. The Court of Claims should have analyzed the transaction using the "incidental to services" test set forth in *Catalina Marketing Sales Corp v Dep't of Treasury*, 470 Mich 13; 678 NW2d 619 (2004), to determine whether the transaction involved the sale of services or the transfer of tangible personal property.

In *Catalina, supra* at 24, our Supreme Court adopted the "incidental to services" test that this Court had articulated in *Univ of Michigan Bd of Regents v Dep't of Treasury*, 217 Mich App 665; 553 NW2d 349 (1996), to determine whether a business transaction involved the sale of services or the transfer of tangible personal property. Under the "incidental to services" test, a court must look objectively "at the entire transaction to determine whether the transaction is principally a transfer of tangible personal property or a provision of

a service." *Catalina, supra* at 24-25. The *Catalina* Court identified six factors to consider when making this determination:

> [1] what the buyer sought as the object of the transaction, [2] what the seller or service provider is in the business of doing, [3] whether the goods were provided as a retail enterprise with a profit-making motive, [4] whether the tangible goods were available for sale without the service, [5] the extent to which intangible services have contributed to the value of the physical item that is transferred, and [6] any other factors relevant to the particular transaction. [*Id.* at 26.]

After applying these factors to this case, I conclude that the transaction between Fisher and NetJets was an agreement for transportation services and, therefore, is not subject to the Michigan use tax. The first *Catalina* factor asks us to consider what the buyer (in this case, Fisher) sought as the object of the transaction. Fisher makes quite clear its objective in entering into this agreement with NetJets: Fisher wanted NetJets to provide transportation services to the company. Fisher presented no other evidence indicating that the company wanted to own or otherwise have responsibility for an airplane. Fisher did not hire a pilot and crew, store, or maintain the airplane. Instead, Fisher assigned these duties to NetJets as part of the transportation services agreement. In fact, Fisher's employees and agents never even used the airplane that Fisher technically co-owned; instead, they were content to use whatever airplane NetJets sent to them.

The second *Catalina* factor asks us to consider what NetJets is in the business of doing. NetJets is not in the business of selling airplanes. Instead, NetJets offers transportation services to corporate clients like Fisher, and it advertises itself as a provider of these services.

The third *Catalina* factor asks us to consider whether the goods were provided as a retail enterprise with a profit-making motive. NetJets' motive was not to make money by simply selling interests in an airplane—this company is in the transportation services business, not the airplane sales business. Instead, the sale of partial interest in an aircraft was a component of a larger agreement to provide transportation services that Net-Jets offered to corporations like Fisher. NetJets' motive was not to profit from the sale of an interest in an airplane, but to profit from providing transportation services.

Fourth, we must consider whether the tangible goods (namely, the interest in an airplane) were available for sale without the associated transportation services. Fisher wanted to purchase a particular package of transportation services from NetJets. In order to receive the level of services from NetJets that it wanted, Fisher was required to enter an agreement that included the purchase of a partial interest in an airplane.[1] Further, NetJets was not in the business of selling interests in airplanes; it only "sold" airplanes as part of a larger transportation services package that it offered its clients.

The fifth *Catalina* factor requires us to consider the extent to which the intangible services offered by Net-

---

[1] If Fisher wanted to receive the level of transportation services that it needed from NetJets, Fisher's only option was to enter into a service agreement with NetJets that included acquiring partial ownership interest in a NetJets airplane. Although NetJets apparently had a Marquis Jet Card program that offered NetJets transportation services without acquisition of an ownership interest in an airplane, each Marquis Jet Card only provided 25 hours of occupied flight time. NetJets did not offer an option for purchasing the amount of transportation services that Fisher required without acquiring partial ownership of a NetJets airplane.

Jets contributed to the value of the physical item (the interest in an airplane) that Fisher received in the transaction. The acquisition of 25-percent interest in an airplane held no value to Fisher without the associated transportation services. None of Fisher's agents knew how to fly an airplane, nor did Fisher indicate that it had any desire to oversee the maintenance and upkeep of an airplane, either independently or in conjunction with another entity. In fact, in the bundle of agreements that Fisher signed when it purchased transportation services from NetJets, it relinquished its right to exert control over the airplane that it partially "owned" back to NetJets, and none of Fisher's agents ever set foot in that airplane. The airplane over which Fisher had partial ownership had no value to Fisher except as a conduit to receive what it really wanted: transportation services provided by NetJets.

These factors, considered together, lead to one inescapable conclusion: the purchase of a 25-percent interest in a NetJets airplane was simply an incidental component of the principal transaction for transportation services that the parties entered into. And in light of the sixth *Catalina* factor, which permits consideration of any other factors relevant to this transaction, I note that two additional points support this conclusion.

First, Fisher never exerted any sort of actual control over the airplane in which it held a partial ownership interest. NetJets' records indicate that Fisher's agents did not use this airplane; in fact, the records indicate that the airplane was never even flown in the state of Michigan. Further, the parties provide no indication that Fisher ever attempted to exert any control over the airplane or requested that NetJets dispatch that airplane for Fisher to use. The ambivalence that both Fisher and NetJets expressed regarding Fisher's use of

the airplane in which it had a partial ownership interest supports the conclusion that neither Fisher nor NetJets cared whether Fisher used the specific airplane in question, but instead cared whether NetJets provided Fisher with the transportation services it needed.

Second, several other jurisdictions have determined that this purchase would be considered an agreement for services and not a sale of tangible personal property. Of particular note are the rulings of the Internal Revenue Service (IRS) and the United States Court of Appeals for the Federal Circuit: both entities have found that such a transaction is for the sale of transportation services. See IRS Private Letter Ruling 9314002 (December 22, 1992), IRS Private Letter Rule 9404006 (October 12, 1993); *Executive Jet Aviation, Inc v United States*, 125 F3d 1463 (CA Fed, 1997). In addition, advisory opinions issued by officials in the taxation departments of both Texas and New York have recognized that such a transaction is for the purchase of transportation services and not a sale of tangible personal property. New York Advisory Opinion No. TSB-A-00(3)S (January 28, 2000); Texas Policy Letter Ruling No. 200011036L (November 9, 2000).

Because Fisher purchased transportation services, not tangible personal property, it is not subject to the Michigan use tax. I would reverse the order of the Court of Claims on this ground.